[No. H008169. Sixth Dist. Feb. 14, 1992.]

ELAINE EVANS, Plaintiff and Appellant, v.
CITY OF SAN JOSE, Defendant and Respondent.

COUNSEL

Ronald A. Zumbrun, Anthony T. Caso and Jonathan M. Coupal for Plaintiff and Appellant.

Joan R. Gallo, City Attorney, and George Rios, Assistant City Attorney, for Defendant and Respondent.

Best, Best & Krieger, Douglas S. Phillips and Robert W. Hargreaves as Amici Curiae on behalf of Defendant and Respondent.

OPINION

COTTLE, J.—Appellant Elaine Evans challenges here, as she did in the trial court, the facial constitutionality of those provisions of Streets and Highways Code section 36500 et seq. and San Jose Ordinance No. 22960 which authorize imposition of assessments on businesses for the purposes of general downtown promotion, the furnishing of music, and other expenditures unrelated to capital improvements. The trial court entered summary judgment in favor of the City of San Jose (city), ostensibly on the ground that Evans failed to exhaust her administrative remedies. For reasons we shall explain, we affirm the judgment.

### FACTS

On October 6, 1988, at a public hearing, the City Council of San Jose adopted a resolution of intention to establish a business improvement

district (BID), pursuant to Streets and Highways Code section 36500 et seq. (the Act), to promote the downtown area.[1] After the hearing, each of the businesses in the proposed district was notified that a hearing would be held on October 20, 1988, to consider establishing the BID. The businesses were told, "If you wish to support or oppose the establishment of the BID you may do so in person at the hearing or by writing the City Council. State law provides that the BID may not be established if the City Council receives protests in writing against its establishment from businesses which would pay a majority of the charges proposed." At the bottom of the notice, each holder of a valid business license was entitled to check one of the following two boxes: "_____ I support the BID proposed by the San Jose Downtown Association." or "_____ I oppose the BID proposed by the San Jose Downtown Association and *hereby register a protest pursuant to Section 36523 of the California Streets & Highways Code*." (Italics added.)

Evans, who owns a 21-unit apartment building in the proposed district, received one of these notices. She sent the ballot in to the city council as requested, indicating she opposed the proposed BID and she was accordingly "register[ing] a protest pursuant to Section 36523 of the California Streets & Highways Code." She also sent a letter to the mayor and city council members announcing her opposition to the BID because of "the manner in which it [was] to be financed." She observed that she already had to pay sewer fees, housing fees, rent mediation fees, utility tax, and a business license tax, all in addition to her real property taxes. She complained that her property was "enough on the outer fringe of a geographical district that it did not qualify for city aid, but close enough to pay for promotional events." She asked, "How much more do you think a business [such as mine where the occupancy rate has dropped to 25%] is able to pay?"

Both Evans's ballot and her letter were marked "received" by the city prior to the public hearing. Her ballot was presumably one of the 90 received by the city opposing the BID. The city also received 29 ballots supporting it. In addition to the ballots, the following documents were filed at the October 20, 1988, public hearing: a feasibility analysis, a petition signed by 274 businesses favoring establishment of the BID, a recommendation from the assistant city manager, 242 business reply cards supporting formation of the BID, a list of the affected businesses, and an affidavit of mailing. Five citizens spoke in opposition to the district, and six spoke in favor.

City approved the BID and passed Ordinance No. 22960, entitled "An Ordinance of the City of San Jose Establishing the Downtown San Jose

---

[1]After the resolution of intention was passed, the Legislature amended without substantially changing the Parking and Business Improvement Area Law of 1979 (Sts. & Hy. Code, § 36500 et seq.). In this appeal, however, we consider only the 1979 Act.

Business Improvement District Pursuant to the Parking and Business Improvement Area Law of 1979" at its October 20th meeting. The stated purpose of the ordinance was to fund: "A. Decoration of any public place in the area. [¶] B. Promotion of public events which are to take place on or in public places in the area. [¶] C. Furnishing of music in any public place in the area. [¶] D. The general promotion of business activities in the area."

The ordinance contained the specific finding that "the businesses lying within the Area will be benefitted by the expenditure of the funds raised by the assessments or charges proposed to be levied." It provided that the charge for each apartment or hotel would be $5 per room or $150 minimum per year, beginning in the third year. The first year would be one-third that amount and the second year two-thirds.

Evans paid the 1989 and 1990 assessments "under protest" and subsequently submitted a written claim for refund to the city. She filed the instant action on January 23, 1990, seeking a refund of the assessments paid and a declaration that the Act and ordinance were unconstitutional "on their face to the extent they purport to authorize the imposition of 'assessments' for the provision of music, decorations, promotions, etc., without a two-thirds vote of the people."

Both city and Evans filed cross motions for summary judgment. After a hearing on November 21, 1990, the court issued the following minute order: "The motion by the plaintiff is denied; no jurisdiction-administrative remedies have not been exhausted. [¶] The motion of the defendant is granted."

Evans timely appealed from the judgment entered on January 30, 1991.

### Discussion

On appeal, Evans contends (1) the court erred in ruling that she did not exhaust her administrative remedies, and (2) the BID assessments were unconstitutionally imposed and collected. As we shall explain, we agree with the first proposition but disagree with the second.

■ It is fundamental in California, as elsewhere, that before a party may obtain judicial review of a final administrative determination, she must first exhaust her administrative remedies. "It is not a matter of judicial discretion,

but is a fundamental rule of procedure . . . . [E]xhaustion of the administrative remedy is a jurisdictional prerequisite to resort to the courts." (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 293 [109 P.2d 942, 132 A.L.R. 715].)[2]

At the summary judgment motion, city asserted, and the trial court agreed, that Evans had not pursued the remedies available to her under the Act. In support of its position, city cited numerous cases in which a litigant was denied judicial review for failing to first exhaust available administrative remedies. These included *Abelleira, supra,* 17 Cal.2d 280 (under the California Unemployment Insurance Act, an adjustment unit of the Employment Commission would determine whether unemployed workers were entitled to benefits; where payment was ordered, the employer could appeal to a referee; the referee would hold a hearing, take evidence and examine witnesses; after the referee issued written findings, the employer could appeal again to the commission. In *Abelleira,* the employer filed suit before the second appeal was complete); *United States* v. *Superior Court* (1941) 19 Cal.2d 189 [120 P.2d 26] (shippers and handlers of citrus fruits could petition the Secretary of Agriculture for a modification of a marketing agreement order; they did so but filed suit before a determination on the modification had been made); *People* v. *Coit Ranch, Inc.* (1962) 204 Cal.App.2d 52 [21 Cal.Rptr. 875] (cantaloupe growers did not follow appeals procedure contained in a marketing order issued pursuant to California Marketing Act of 1937); *Flores* v. *Los Angeles Turf Club* (1961) 55 Cal.2d 736 [13 Cal.Rptr. 201, 361 P.2d 921] (appellant failed to follow detailed procedures governing appeals to the California Horse Racing Board); *Metcalf* v. *County of Los Angeles* (1944) 24 Cal.2d 267 [148 P.2d 645] (rock crushing company sought to enjoin enforcement of zoning ordinance prohibiting rock crushing but failed to apply under section 21 of the applicable ordinance to have its property excepted from the restriction; the company also failed to apply under another ordinance for a license to operate a rock quarry); *Tushner* v. *Griesinger* (1959) 171 Cal.App.2d 599 [341 P.2d 416] (further hearings before an examiner relating to suspension or revocation of real estate brokers' licenses were still pending when action filed); *Alexander* v. *State Personnel Bd.* (1943) 22 Cal.2d 198 [137 P.2d 433] (petition seeking review of State Personnel Board decision discharging petitioner from service properly dismissed where no petition for rehearing was filed within the time prescribed by the Civil Service Act).

---

[2]In *Abelleira,* "[t]he question [presented was] whether boards and commissions, charged with the administration of a statute, may carry on their administrative proceedings to completion before being subjected to judicial review." (*Id.,* at p. 286.) The court reasoned that if a court allowed a suit to be maintained prior to a final administrative determination, it would be interfering with the subject matter jurisdiction of another tribunal. (*Id.,* at p. 293.)

Two common threads link these cases: a detailed administrative procedure was available, and the appellant either ignored it or did not await a final determination before seeking judicial intervention. ■ Here, in contrast, the administrative remedies—though existent—were neither exhaustive nor detailed and did not provide several levels of administrative review. Furthermore, with respect to the limited remedies available, Evans pursued them to the extent possible.

City cites three cases, two written in 1904, for the proposition that the exhaustion doctrine is applicable to a challenge to the formation of an assessment district. In *O'Dea* v. *Mitchell* (1904) 144 Cal. 374 [77 P. 1020], the enabling legislation provided that " 'objections *to the extent* of the district' may be made in writing by interested parties within ten days after the expiration of the time of publication of notice; that the clerk shall lay such objection before the council, and the council at its next meeting shall fix a time for hearing the objections; that the clerk shall notify the objectors; that the council shall hear and pass upon the objections, and its decision shall be final and conclusive; that if the objections be sustained all proceedings shall be stopped, but if overruled the proceedings shall continue. This is a remedy which the party interested should, at least in the first instance, avail himself of; and appellants not having done so, and having allowed the work to progress and to be completed without objection, cannot now be heard to make the objection which they should have made before the work commenced and at the time and in the manner prescribed in the statute, where the error, if any, could have been corrected. [Citation.]" (*Id.*, at p. 378.) Thus, the court held that submitting a written objection would have satisfied the aggrieved owner's obligation to exhaust his administrative remedies. That is what Evans did here.

In *Duncan* v. *Ramish* (1904) 142 Cal. 686, 692 [76 P. 661], the court observed that "where the property-owner has an opportunity given him, under the prescribed proceedings, to appear and contest the question before the legislative body, the determination of that body on the subject of benefits is final, and that if he fails to appear he thereby admits the finality of the determination." In the present case Evans was given an opportunity to register a protest pursuant to the Act by checking the appropriate box on her ballot. She not only did that but she also wrote the city council prior to its public hearing.

In *Teeter* v. *Los Angeles* (1930) 209 Cal. 685 [290 P. 11], the court held that "[u]nder the Street Improvement Act of 1911, . . . all protests against proposed work must be first filed and pursued before the city council, and all objections not so made shall be deemed waived." (*Id.*, at p. 688.) Here Evans

filed and pursued her protest to the formation of the BID before the city council; she sent in her ballot formally registering a protest and a separate letter further explaining her objections to the proposed BID.

City also argues that the protest procedure set forth in Streets and Highways Code section 36523 is not the administrative remedy Evans was obligated to exhaust. It makes this claim in spite of the fact that no other remedies are specified in the Act. However, city claims we should infer other remedies from the following: because a public hearing[3] is required to establish a BID, and because the public *can* appear at that hearing, the public must appear if it wishes later to seek judicial review of the administrative agency's decision. (Cf. *Duncan* v. *Ramish, supra,* 142 Cal. at p. 692.) Under the facts of this case, we must disagree. This Act set out a specific protest procedure. Evans followed that procedure. She also wrote a letter to the city council which was received and considered prior to the public hearing. We conclude that Evans satisfied her obligations to pursue administrative remedies.

 We therefore turn to the second issue: whether the Act and ordinance are unconstitutional on their face, at least "to the extent they purport to authorize the imposition of 'assessments' for the provision of music, decorations, promotions, etc., without a two-thirds vote of the people."

On June 6, 1978, the voters of this state passed by initiative a measure known as Proposition 13, which added article XIII A to the California Constitution. Its purpose was to provide "effective real property tax relief" to the taxpayers of California. (*Amador Valley Joint Union High Sch. Dist.* v. *State Board of Equalization* (1978) 22 Cal.3d 208, 230 [149 Cal.Rptr. 239, 583 P.2d 1281].) "[A]rticle XIII A consists of four major elements, a real property *tax rate* limitation (§ 1), a real property *assessment* limitation (§ 2), a restriction on *state* taxes (§ 3), and a restriction on *local* taxes (§ 4)." (*Id.,* at p. 231, italics in original.) This appeal raises the issue of whether the Act and ordinance run afoul of section 4, which places restrictions on local taxes.

---

[3]City actually claims that two public hearings are called for in the Act, one when the BID is established and one when the resolution of intention is passed. However, the Act does not require a public hearing for the resolution of intention. That requirement city infers from Government Code section 54950 which generally provides that because "public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business[,] . . . their actions be taken openly and . . . their deliberations be conducted openly." Furthermore, at the hearing on the resolution of intention, "public testimony would be heard but . . . limited to the scheduling of the public hearing [establishing the BID]." Thus, Evans would not have been permitted to object to the formation of the BID even if she had attended the hearing at which the resolution of intention was passed.

■ Section 4[4] of article XIII A (hereafter section 4) limits the ability of cities, counties, and special districts[5] to impose "special taxes" by requiring the district to first obtain approval of two-thirds of the qualified electors in the district. The purpose of this section is to prevent the government from recouping its losses from decreased property taxes, due to Proposition 13, by imposing or increasing other taxes. (*Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100 [211 Cal.Rptr. 133, 695 P.2d 220].)

■ In the present case, the Act and ordinance authorize imposition of an "assessment" for downtown promotion without requiring approval by two-thirds of the electorate. If such an assessment is a "special tax," its imposition would be unconstitutional. The remainder of this opinion deals with the question of whether an assessment for downtown promotion is a special tax or whether it is some other type of revenue-generating procedure.

Recently the Supreme Court clarified its earlier pronouncement in *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935], that "special taxes" were those "levied for a specific purpose rather than . . . a levy placed in the general fund to be utilized for *general governmental purposes.*" It explained that that definition "would allow a municipality to recover completely any property tax revenues lost under Proposition 13 merely by enacting an alternative form of taxation, the revenues of which being earmarked for general government purposes." (*Rider* v. *County of San Diego, supra,* 1 Cal.4th 1, 14, citing with approval dis. opn. of Richardson, J., in *Farrell, supra.*) ■ The *Rider* court opined that a "more reasonable interpretation of section 4, consistent with *Farrell*'s [citation] guidelines, is that a 'special tax' is one levied to fund a specific governmental project or program, such as the construction and financing of the County's justice facilities." (32 Cal.3d at p. 15.)

■ Evans contends the Act and ordinance on their face impose a "special tax" without requiring a concurring vote of two-thirds of the electorate; therefore, she argues they violate section 4 and are unconstitutional.

We disagree. Proposition 13 generally and section 4 specifically do not apply at all to certain revenue-generating procedures employed by local

---

[4]That provision provides: "Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

[5]In *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1 [2 Cal.Rptr.2d 490, 820 P.2d 1000], the Supreme Court defined "special districts" as "any local taxing agency created to raise funds for city or county purposes to replace revenues lost by reason of the restrictions of Proposition 13." (*Id.,* at p. 11.)

governments. For example, section 4 does not embrace fees charged in connection with regulatory activities that do not exceed the reasonable cost of providing services necessary to the activity for which the fees are charged. (See e.g., *Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365, 375 [228 Cal.Rptr. 726, 721 P.2d 1111] [ordinance may impose rental unit fee which does not exceed sum necessary to cover costs of administering prescribed hearing process]; *Trent Meridith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317 [170 Cal.Rptr. 685] [requirement that a subdivider either pay fees or dedicate land to a local school district to relieve conditions of overcrowding caused by the development not a special tax but rather a valid exercise of the police power]; *Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656 [166 Cal.Rptr 674] [fees for county services in processing subdivision, zoning, and other land-use applications not a "special tax" within the meaning of Proposition 13]; *Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 905 [223 Cal.Rptr. 379] [fees for land-use regulatory activities outside realm of special taxes].) Numerous statutory schemes impose fees on business entities to defray the costs of policing and regulating those activities. (See e.g., Food & Agr. Code, § 66621 et seq. [fees imposed on the handlers of iceberg lettuce to pay for administering Iceberg Lettuce Commission]; Food & Agr. Code, § 65600 et seq. [similar fees for grape growers].)

Likewise, section 4 does not apply to special assessments. (E.g., *Solvang Mun. Improvement Dist.* v. *Board of Supervisors* (1980) 112 Cal.App.3d 545 [169 Cal.Rptr. 391], criticized on another ground in *City of San Diego* v. *Holodnak* (1984) 157 Cal.App.3d 759, 763 [203 Cal.Rptr. 797]; *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974 [156 Cal.Rptr. 777]; *City Council* v. *South* (1983) 146 Cal.App.3d 320 [194 Cal.Rptr. 110].) ▪ Special assessments are charges imposed by a local district " " "upon real property within a pre-determined district, made under express legislative authority for defraying in whole or in part the expense of a permanent public improvement therein . . . ." ' [Citation.]" (*San Marcos Water Dist.* v. *San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 161 [228 Cal.Rptr. 47, 720 P.2d 935].)

The assessment on businesses for downtown promotion is not a true special assessment.[6] It is neither a charge on real property nor is its purpose to pay for permanent public improvements specifically benefitting the assessed real property. ▪ However, the fact that it is not a true special

---

[6]Within a year after Proposition 13 was passed, the Legislature enacted the Parking and Business Improvement Area Law of 1979. The Parking and Business Improvement Area Law of 1965 (Sts. & Hy. Code, §§ 36000 to 36081) had referred to "taxes" for the "acquisition, construction or maintenance of parking facilities for the benefit of the area. [¶] (b) Decoration of any public place in the area. [¶] (c) Promotion of public events which are to take place on

assessment does not necessarily mean it is a special tax within the meaning of section 4. The reasons the regulatory and development fee cases and the special assessment cases are exempt from the reach of Proposition 13 are the same reasons the Act and ordinance should also be exempt from its reach. With each of these cases, a discrete group receives a benefit (for example, a permit to build or inspection of produce) or a service (for example, providing and administering a rental dispute mediation and arbitration hearing process) or a permanent public improvement (such as a local park or landscaped median islands on a local road) which inures to the benefit of that discrete group. The public as a whole may be incidentally benefitted, but the discrete group is specially benefitted by the expenditure of these funds. (Cf. *City of Baldwin Park* v. *Stoskus* (1972) 8 Cal.3d 563, 568 [105 Cal.Rptr. 325, 503 P.2d 1333, 59 A.L.R.3d 525]; *San Diego Gas & Elec. Co.* v. *Sinclair* (1963) 214 Cal.App.2d 778 [29 Cal.Rptr. 769].) The public should not be required to finance an expenditure through taxation which benefits only a small segment of the population. (Cf. *Rider* v. *County of San Diego, supra,* 1 Cal.4th 1 [½ percent sales tax imposed to fund construction of justice facilities].) If it is asked to do so, it must agree by a two-thirds vote. On the other hand, where the burden for these expenditures is borne by the group specifically benefitted by them, Proposition 13 is not implicated.

The Legislature and city each determined that downtown businesses would be benefitted from establishment of a BID. The city specifically found "that the businesses lying within the Area will be benefitted by the expenditure of the funds raised by the assessments or charges proposed to be levied." The Mayor of San Jose wrote Evans explaining that the BID would "provide funds to make a pleasant atmosphere for Downtown residents to live" and would "attract residents and patrons," obviously to the benefit of downtown landlords and businesses.[7] The San Jose Downtown Association

---

or in public places in the area. [¶] (d) Furnishing of music in any public place in the area. [¶] (e) The general promotion of retail trade activities in the area."

The 1979 Act, on the other hand, referred to "assessments" for the "acquisition, construction, or maintenance of parking facilities for the benefit of the area. [¶] (b) Decoration of any public place in the area. [¶] (c) Promotion of public events which are to take place on or in public places in the area. [¶] (d) Furnishing of music in any public place in the area. [¶] (e) The general promotion of business activities in the area." (Stats. 1979, ch. 372, § 1, p. 1246.)

The 1989 revision provides, no doubt to avoid the sweep of Proposition 13, that "Assessments levied under this part are not special taxes." (Sts. & Hy. Code, § 36504.) However, as the court observed in *Rider* v. *County of San Diego, supra,* 1 Cal.4th 1, "reliance on the Legislature's designation of the tax . . . is of minor importance in light of the realities underlying its adoption and its probable object and effect. [Citation.] The statute at issue was undoubtedly drafted with section 4 . . . firmly in mind." (*Id.,* at pp. 14-15.)

[7]Evans emphasized that she was making a facial attack on the Act and ordinance and that the issue of benefit to her, therefore, need not be reached. We observe, nevertheless, that the

explained that the "objective of downtown revitalization will remain unchanged: to give more and more San Joseans reasons to come downtown to live, work, shop and play."[8]

The Act challenged here is neither a true regulatory fee nor a true special assessment. Nevertheless it is analogous to those other schemes which impose the financial burden for a special benefit upon the person or entity receiving that benefit. The City of San Jose and the Legislature have determined that downtown promotion inures to the benefit of businesses and landlords within the BID because the funds are used to make the downtown area a safer, cleaner, and more economically viable area. Under these circumstances, where the business license holder is specially benefitted, we hold that the assessment is not a "special tax" as contemplated by article XIII A of the California Constitution.

For the foregoing reasons and not because Evans failed to exhaust her administrative remedies, the judgment is affirmed. Costs on appeal to respondent.

Capaccioli, Acting P. J., and Premo, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 29, 1992.

potential benefit to her from downtown revitalization was extraordinary; she stated she had only a 25 percent occupancy rate.

[8]Likewise, the Legislature declared in section 3 that the Act "is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV and shall go into immediate effect. The facts constituting such necessity are: [¶] Parking and business improvement areas provide vital services which are necessary for the benefit of the business and commercial activity of the state. In order for these vital services not to be discontinued because of a lack of revenue, it is necessary that this act take effect immediately." (Stats. 1979, ch. 372, § 3, p. 1250.)