[No. A114956. First Dist., Div. Four. Apr. 29, 2008.]

BAY AREA CELLULAR TELEPHONE COMPANY et al., Plaintiffs and Respondents, v.
CITY OF UNION CITY, Defendant and Appellant.

## COUNSEL

Meyers, Nave, Riback, Silver & Wilson, Michael S. Riback, Joseph M. Quinn and Michael T. O'Flannigan for Defendant and Appellant.

Dennis J. Herrera, City Attorney (San Francisco), Buck Delventhal, Chief Government Team Deputy Attorney, Julie K. Van Nostern, Chief Tax Team Deputy Attorney, Danny Chou, Chief Appellate Litigation Attorney, and Jean H. Alexander, Deputy City Attorney, as Amici Curiae for Defendant and Appellant.

DLA Piper US, David Colker, David F. Gross and Stephen Chiari for Plaintiffs and Respondents.

Harold Griffith as Amicus Curiae for Plaintiffs and Respondents.

## OPINION

RIVERA, J.—This case presents the question of whether a fee imposed on telephone lines by defendant City of Union City (the City) to fund its 911 emergency communication system is a special tax that must be approved by two-thirds of the voters in the City. The trial court ruled it was a tax, and entered judgment against the City and in favor of the plaintiffs in this action for declaratory relief.[1] We affirm.

## I. BACKGROUND

The Legislature enacted the Warren-911-Emergency Assistance Act (Gov. Code,[2] § 53100 et seq.) (the Warren Act) in 1972. The Warren Act declared that the establishment of a uniform, statewide emergency number was a matter of statewide concern, and required every local public agency to establish and operate, or to be part of, a "basic system" that automatically connects a person dialing the digits 911 to a public safety answering point. (§§ 53100, 53107, 53109.)

In 2003, the City established an "Emergency Communication System Response Fee" (the Fee) (City Mun. Code, ch. 7.20) by adopting ordinance No. 617-03 (the Ordinance). The Fee was imposed on "every person who maintains access to the 911 communication system by subscribing to local telephone service within the City of Union City. . . . [W]ith respect to wireless telephone services, a person shall be construed to subscribe to local telephone service within the City of Union City if he or she has a 'place of primary use,' as such term is defined in the Mobile Telecommunications Sourcing Act, 4 U.S.C. Section 124(8), within the geographic boundaries of the City."[3] (City Mun. Code, ch. 7.20, § 7.20.040, subd. A.) The Fee is paid on a flat rate, per-line basis, in an amount established by city council resolution. (Id., subd. B.) Certain access lines are exempted from the Fee, including coin-operated telephones, nonprofit hospitals, and nonprofit educational organizations. (Id., § 7.20.050.) The Fee is collected from the telephone subscriber by the service supplier, which remits the revenues to the City. (Id.,

---

[1] The plaintiffs in this action are Bay Area Cellular Telephone Company doing business as AT&T Wireless Services; GTE Mobilnet of California Limited Partnership doing business as Verizon Wireless; Cingular Wireless LLC; Silvano Mendoza; and Walid Achikzai (collectively plaintiffs).

[2] All undesignated statutory references are to the Government Code.

[3] Title 4 United States Code section 124(8) defines " 'place of primary use' " to mean "the street address representative of where the customer's use of the mobile telecommunications service primarily occurs, which must be—[¶] (A) the residential street address or the primary business street address of the customer; and [¶] (B) within the licensed service area of the home service provider."

§ 7.20.070, subd. A.) The revenues collected are deposited into an emergency response fund, to be used only for the expenses of the 911 communication system. (*Id.*, § 7.20.080.) They are never commingled with any other City funds. The Fee was expected to recover 75 percent of the operating, maintenance, and improvement costs for the City's emergency communication system. After calculating the costs of the system,[4] the City distributed the cost among all access lines by dividing the cost by the estimated number of lines in the City, including those that were exempt from the Fee. Regular access lines are charged $3.22 per month; trunk lines—with the capacity of nine individual access lines—are charged $29.98 per month; and high-capacity trunk lines—with the capacity of 216 individual access lines—are charged $77.28 per month.

The pertinent facts regarding the emergency communication system and the Fee are largely undisputed. The City operates an emergency dispatch system available to persons dialing 911 from a location within the City. Before the Ordinance went into effect, 911 services were funded from the City's general fund. In fiscal year 2004–2005, after the Ordinance went into effect, 911 services were funded from the general fund and from revenues obtained under the Ordinance. Funds from the Ordinance were designed to finance improvements to and operation of the City's "enhanced" 911 communication system, which the Ordinance provided would include selective routing, automatic number identification, automatic location identification, and wireless 911 access. (City Mun. Code, ch. 7.20, §§ 7.20.010, subd. A, 7.20.020, subd. A.)

The City describes the system as "a multi-point Emergency Communication Response System that allows individuals located within Union City dialing the digits 9-1-1, or designated seven-digit police and fire emergency numbers, or City business phone lines, to gain direct access to an emergency communication center that provides emergency services dispatch." Calls to a seven-digit emergency line and to 911 are handled by the same dispatchers in the same manner. However, the City's enhanced 911 system automatically provides the location and number identification for the caller. Wireless 911 calls are answered initially by the California Highway Patrol, which forwards those emergency calls needing a police response to the City police department's seven-digit emergency line.

Over 99 percent of households in the City have telephone service, and the City is unaware of anyone in the City who is not part of a household with an access line or of anyone who maintains a place of employment in the City

---

[4] The parties disagreed below on whether the City's calculation of the costs of the system was overinclusive. For purposes of our analysis, we will assume that the Fee covers less than the total cost of operating the system.

without an access line. Any person physically in the City has access to the emergency communication system. The City has not limited access to either the system or emergency services to those who are subject to the Fee. Telephone subscribers who are subject to the Fee but have not paid it are not denied access to the 911 system and emergency services.

Plaintiffs brought this action for declaratory relief in June 2004. They alleged in their first cause of action that the Fee was an invalid tax in violation of California Constitution, article XIII C, section 2 (Proposition 218); in their second cause of action that the Fee was an illegal property-related fee in violation of Proposition 218; in their third cause of action that it was an illegal special tax under section 50076 as to wireless phone subscribers and required voter approval under Proposition 218; and in their fourth cause of action that it was an illegal fee imposed on wireless subscribers.

Plaintiffs moved for summary adjudication of the first cause of action, and the trial court granted the motion. The City made a cross-motion for summary adjudication of the first, second, and third causes of action. The trial court denied the cross-motion on the ground that the accompanying separate statement of undisputed material facts did not comply with California Rules of Court, former rule 342.[5] At plaintiffs' request, the court dismissed the remaining causes of action, and entered judgment in favor of plaintiffs, declaring that the Fee was a special tax under California law, and that it was void because it was enacted without a vote of the electorate in violation of California Constitution, articles XIII A and XIII C. This timely appeal ensued.

## II. DISCUSSION

### A. *Guiding Legal Principles*

█ Proposition 218, passed by the voters in 1996, added articles XIII C and XIII D to the California Constitution. As pertinent here, Proposition 218 defines a "special tax" as "any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund" (Cal. Const., art. XIII C, § 1, subd. (d)), and provides that no local government may impose, extend, or increase any special tax unless the electorate has approved it by a two-thirds vote (*id.*, § 2, subd. (d)). The proposition, entitled the "Right to Vote on Taxes Act," included this statement of purpose: " 'The people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to require voter approval of

---

[5] The California Rules of Court have since been renumbered. Former rule 342 is now rule 3.1350 (hereafter rule 3.1350).

tax increases. However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent.' (See Historical Notes, 2A West's Ann. Cal. Const. (2004 supp.) foll. art. XIII C, § 1, p. 55; *Apartment Assn. of Los Angeles County*[*, Inc. v. City of Los Angeles* (2001)] 24 Cal.4th [830,] 838 [102 Cal.Rptr.2d 719, 14 P.3d 930].)" (*Barratt American, Inc. v. City of San Diego* (2004) 117 Cal.App.4th 809, 816 [12 Cal.Rptr.3d 132].) Section 5 of Proposition 218 required that the provisions of the act be "liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 5, p. 109, reprinted at Historical Notes, 2A West's Ann. Cal. Const. (2008 supp.) foll. art. XIII C, § 1, p. 85 (Historical Notes).)

Certain kinds of impositions for specific purposes, however, are treated not as special taxes subject to the voter approval requirements but as fees not subject to those requirements. Whether an imposition is a tax or a fee is a question of law for the appellate court to decide on an independent review of the facts. (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 873–874 [64 Cal.Rptr.2d 447, 937 P.2d 1350] (*Sinclair*); *California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 944 [94 Cal.Rptr.2d 535]; *Northwest Energetic Services, LLC v. California Franchise Tax Bd.* (2008) 159 Cal.App.4th 841, 854 [71 Cal.Rptr.3d 642] (*Northwest Energetic*).)

■ Our Supreme Court in *Sinclair, supra,* 15 Cal.4th at pages 873–874, discussed "certain general guidelines used in determining whether 'taxes' are involved in particular situations."[6] As the court noted: "The cases recognize that 'tax' has no fixed meaning, and that the distinction between taxes and fees is frequently 'blurred,' taking on different meanings in different contexts. [Citations.] In general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted. [Citations.] Most taxes are compulsory rather than imposed in response to a voluntary decision to develop or to seek other government benefits or privileges. [Citations.] But compulsory fees may be deemed legitimate fees rather than taxes. [Citation.] [¶] The 'special tax' cases have involved three general categories of fees or assessments: (1) special assessments, based on the value of benefits conferred

---

[6] *Sinclair* was decided under California Constitution, article XIII A, which was approved by the voters in 1978 as Proposition 13. (*Sinclair, supra,* 15 Cal.4th at p. 872.) However, cases decided under Proposition 13 have been used in analyzing the provisions of Proposition 218. (See *Howard Jarvis Taxpayers Assn. v. City of San Diego* (1999) 72 Cal.App.4th 230, 239–240 [84 Cal.Rptr.2d 804].)

on property; (2) development fees, exacted in return for permits or other government privileges; and (3) regulatory fees, imposed under the police power." (*Sinclair*, at p. 874.) In connection with the last category, the court in *Kern County Farm Bureau v. County of Kern* (1993) 19 Cal.App.4th 1416, 1421 [23 Cal.Rptr.2d 910] (*Kern County*) stated: " 'Special taxes must be distinguished from regulatory fees imposed under the police power, which are not subject to the constitutional provision [since they are not taxes at all]. [Citation.] Special taxes do not encompass fees charged to particular individuals in connection with regulatory activities or services when those fees do not exceed the reasonable cost of providing the service or activity for which the fee is charged, and are not levied for unrelated revenue purposes.' " (See also *Collier v. City and County of San Francisco* (2007) 151 Cal.App.4th 1326, 1346 [60 Cal.Rptr.3d 698].)[7]

The courts have also recognized that certain "user fees" are not taxes. (See *Isaac v. City of Los Angeles* (1998) 66 Cal.App.4th 586, 596–597 [77 Cal.Rptr.2d 752] (*Isaac*).) In *Isaac*, the court described user fees as "those which are charged only to the person actually using the service; the amount of the charge is generally related to the actual goods or services provided." (*Id.* at p. 597.) Thus, a user fee is "payment for a specific commodity purchased." (*Ibid.*; see also *Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 957 [5 Cal.Rptr.3d 520] [sewer service fees].)

Despite these classifications, a revenue measure "may have attributes of more than one of the traditional revenue devices, and may be valid despite the measure's 'hybrid' nature." (*Kern County, supra,* 19 Cal.App.4th at p. 1422.) Therefore, a local government may "seek to justify a revenue device under alternative classifications." (*Ibid.*)

The court in *Isaac* made clear that regardless of the type of fee, it must bear some reasonable relation to the benefits and costs associated with the service: A special assessment is based on the benefit to the specific property; a development fee is not considered a special tax if it bears a reasonable relation to the development's probable cost to the community and benefits

---

[7] The difference between regulatory measures and taxes was described in *Oakland Raiders v. City of Berkeley* (1976) 65 Cal.App.3d 623 [137 Cal.Rptr. 648]. There, the court noted that the ordinance in question contained "no provision which would regulate the conduct of anyone who is subject to the ordinance," and went on to conclude that "[w]here [a] statute contains no regulatory provisions, but only provides for the subjects and amounts of taxation," it is a tax. (*Id.* at p. 627.) Similarly, the court in *United Business Com. v. City of San Diego* (1979) 91 Cal.App.3d 156, 165 [154 Cal.Rptr. 263], stated: " ' "If revenue is the primary purpose and regulation is merely incidental the imposition is a tax; while if regulation is the primary purpose the mere fact that incidentally a revenue is also obtained does not make the imposition a tax . . . [.]" [Citations.]' " In short, "[a] 'regulatory fee' is an imposition that funds a regulatory program." (*Northwest Energetic, supra,* 159 Cal.App.4th at p. 857.)

derived from the community; a regulatory fee is limited to "the reasonable cost of the services necessary for the activity for which the fee is charged and for carrying out the purpose of the regulation"; and a user fee is charged to the person using the service and its amount is related to the goods and services actually provided. (*Isaac, supra,* 66 Cal.App.4th at pp. 595–597.) Thus, in explaining the reasons that regulatory and development fees and special assessments are not regarded as special taxes, the court in *Evans v. City of San Jose* (1992) 3 Cal.App.4th 728, 738 [4 Cal.Rptr.2d 601] (*Evans*), stated, "With each of these cases, a discrete group receives a benefit (for example, a permit to build or inspection of produce) or a service (for example, providing and administering a rental dispute mediation and arbitration hearing process) or a permanent public improvement (such as a local park or landscaped median islands on a local road) which inures to the benefit of that discrete group. The public as a whole may be incidentally benefitted, but the discrete group is specially benefitted by the expenditure of these funds. [Citations.] The public should not be required to finance an expenditure through taxation which benefits only a small segment of the population."

■ A tax, on the other hand, can be levied " ' "without reference to peculiar benefits to particular individuals or property." ' [Citations.] Indeed, '[n]othing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied.' " (*Knox v. City of Orland* (1992) 4 Cal.4th 132, 142 [14 Cal.Rptr.2d 159, 841 P.2d 144].)

B. *The Fee Is a Special Tax*

■ The principles discussed above lead us to conclude that the Fee is a special tax, and as such is subject to Proposition 218. As noted by the trial court, the parties "essentially concede[d] that the 911 Charge does not fit into the category of a special assessment, a development fee, or a regulatory fee,"[8] and the issue was whether the Fee was properly characterized as a user fee rather than a tax. In concluding the Fee was a tax, the court pointed out that those who paid the Fee received no benefit not received by those who did not pay (and thus by the general public), thereby negating the distinguishing feature of a user fee.

On appeal, the City acknowledges that the Fee does not fall neatly into any of the recognized categories of fees, stating: "The 911 Fee at issue here . . .

---

[8] *In its answer to the complaint, the City admitted the Fee was not a regulatory fee. The Ordinance provided that it was enacted "solely to provide revenue for eligible project costs and eligible operating costs," and that it was "not enacted for regulatory purposes or for general revenue purposes." (City Mun. Code, ch. 7.20, § 7.20.010, subd. D.) On appeal, the City asserts that the Fee "arguably advances a regulatory purpose," but fails to identify any such purpose.*

defies simple classification." The reason the Fee defies such classification is that it does not share the essential characteristics of the assessments and fees that have been held not to be special taxes. Most fundamentally, there is no discrete group that is specially benefitted by the imposition. (See *Evans, supra,* 3 Cal.App.4th at p. 738.) The 911 system benefits every inhabitant of the City, and in fact benefits anyone who is in the City when an emergency arises, whether or not an inhabitant and whether or not subject to the Fee. The Fee inures to the benefit of the public as a whole, not to any particular group within the public. (See *ibid.*)

■ Furthermore, the Fee is not charged for *use* of the 911 system, but for *access* to the system, whether or not a resident ever places an emergency call. The access is to a system that is part of a governmental service. In enacting the Warren Act, the Legislature declared that it was in the public interest to shorten the time required for a citizen to request and receive emergency aid, that the establishment of a uniform emergency number was a matter of statewide concern, and that one of the purposes of the act was to encourage local governments to develop and improve emergency communication procedures and facilities so as to be able to respond quickly to 911 emergency calls. (§ 53100, subd. (b).) We see no principled distinction between an imposition charged simply for access to a governmental service that is equally available to the public as a whole and a special tax.

The City disagrees, arguing that the Fee does not have the characteristics of a tax. According to the City, "[t]he Fee is voluntary, is paid by phone service subscribers in exchange for efficient 911 access, and does not raise revenues for the City's general fund." We have already rejected the argument that the Fee is imposed in exchange for "access" to a governmental service and therefore is not a tax. And the fact that the Fee does not raise revenues for the City's general fund does not change our conclusion. The essence of a special tax "is that its proceeds are earmarked or dedicated in some manner to a specific project or projects" (*Neecke v. City of Mill Valley* (1995) 39 Cal.App.4th 946, 956 [46 Cal.Rptr.2d 266]), and Proposition 218's definition of special taxes encompasses "any tax imposed for specific purposes" (Cal. Const., art. XIII C, § 1, subd. (d)). Although Proposition 218 specifies that a special tax includes a tax imposed for specific purposes even if the proceeds are placed into a general fund (see *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2003) 106 Cal.App.4th 1178, 1185 [132 Cal.Rptr.2d 1]), it is not limited to such taxes but by its terms encompasses those placed into a separate fund.

Finally, we also reject the City's contention that the Fee is not a special tax because it is voluntary. According to the City, the Fee's voluntary nature is

shown by the fact that—while the Fee is compulsory for nonexempt individuals and businesses with telephone service—those subject to the Fee voluntarily consented to pay it when they chose to obtain telephone service. For this contention, the City relies on *Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409 [9 Cal.Rptr.3d 121, 83 P.3d 518] (*Richmond*). There, our Supreme Court concluded that a capacity charge for new water service connections did not violate the restrictions on assessments of article XIII D of the California Constitution and was consistent with Proposition 218's goal to enhance taxpayer consent, stating that presumably any costs imposed on customers receiving service through *existing* connections would be subject to Proposition 218's voter approval requirements, and that customers who apply for *new* connections "give consent by the act of applying." (*Richmond,* at pp. 418, 420.)

*Richmond* does not lead to the conclusion that the Fee is not a special tax. The question there was not whether the charge for new water service connections was a special tax or a fee, but whether it was an assessment subject to the procedures and requirements of California Constitution, article XIII D, section 4. (*Richmond, supra,* 32 Cal.4th at pp. 418–425.) In any case, the Fee is fundamentally different from the charge in *Richmond* in at least two respects. First, it is not imposed in exchange for the voluntary decision to seek a governmental service, but is instead imposed in response to the decision to seek telephone service from a private provider. Second, the Ordinance does not restrict the Fee to *new* telephone customers, but applies to all persons who maintain telephone service—many of whom presumably did not contemplate the fee when signing up for telephone service.[9]

Nor are we persuaded by the City's reference to *Pajaro Valley Water Management Agency v. Amrhein* (2007) 150 Cal.App.4th 1364 [59 Cal.Rptr.3d 484] (*Pajaro Valley*). There, the court concluded that a groundwater augmentation charge was an incident of property ownership and hence subject to the restrictions of California Constitution, article XIII D, part of Proposition 218, which restricts the power of public agencies to impose a "levy other than an ad valorem tax, a special tax, or an assessment, . . . upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service." (Cal. Const., art. XIII D, § 2, subd. (e); see *Pajaro Valley,* at pp. 1384–1393.) Before deciding that the charge was an incident of property ownership, the court rejected the argument that it was a special tax, reasoning that although the charge was intended to finance improvements, and thus to raise revenue (see *Sinclair, supra,* 15 Cal.4th at p. 874), it was also "charged in return for the benefit of ongoing groundwater extraction and the service of securing the water supply for everyone in the

---

[9] We note that the compulsory nature of an imposition does not in itself transform a valid fee into a tax. (See *Kern County, supra,* 19 Cal.App.4th at p. 1424.)

basin" (*Pajaro Valley, supra*, 150 Cal.App.4th at p. 1381; see *id.* at pp. 1379–1381). The charge in *Pajaro Valley*, however, was based either on actual consumption of water (in the case of large water users with metered wells) or an estimated use rate; for residential users, this rate was based on the estimated average rate of consumption per dwelling; and for unmetered agricultural use it was based on a number of factors, including the type of crop grown on the land. The charges could be adjusted if a well's estimated consumption did not accurately reflect the amount extracted. (*Id.* at p. 1374.) Here, the Fee is not based on actual or estimated use of emergency services, but simply on the presence of a telephone line, whether or not that line is ever used to call the City's emergency communication system. As we have discussed, such a charge is not a legitimate user fee.

The City argues, however, that section 50076 establishes that the Fee is not a special tax.[10] Section 50076 was enacted in 1979, and was part of legislation intended to provide cities, counties and districts with authority to impose special taxes pursuant to Proposition 13. (§ 50075.) Section 50076 provides: "As used in this article, 'special tax' shall not include any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes." The City points out that the revenues generated by the Fee do not exceed the cost of providing 911 services and that the Fee is not levied for general revenue purposes. Therefore, the City contends, the Fee is not a special tax.

■ This argument misses the point. Section 50076 on its face applies to fees imposed for services or regulatory activities provided by local entities. As we have discussed, the Fee does not fall into either of these categories. The Ordinance provided that it was not enacted for regulatory purposes, and the City has not suggested any regulatory purpose it might serve. Nor is the Fee imposed for "service[s]." The Fee must be paid by all nonexempt telephone service subscribers in the City—encompassing virtually all nonexempt households and businesses—whether or not they ever use 911 services. A fee for *access* to a governmental service is not the same as a fee for *use* of that service.[11]

The City also relies on *Carlsbad Mun. Water Dist. v. QLC Corp.* (1992) 2 Cal.App.4th 479 [3 Cal.Rptr.2d 318]. There, in considering section 50076 and

---

[10] We grant plaintiffs' request for judicial notice filed March 28, 2007. We have considered the legislative history of section 50076 provided, but do not find it helpful in resolving the issue before us.

[11] Indeed, if it were, Proposition 218 could easily become meaningless. Taxes paid by the public to fund police or fire services available to all could be renamed "public safety access fees" and be exempt from the voter approval requirements. Taxes paid to maintain city streets could be renamed "road access fees." The list of possibilities is endless.

Proposition 13, the court explained: "The term 'special taxes' must be strictly construed and ambiguities resolved so as to limit the situations to which the two-thirds requirement applies because of the inherently undemocratic requirement that the tax must be approved by a supermajority of the electors." (*Carlsbad*, at pp. 485–486.) We doubt the applicability of this rule to cases decided under Proposition 218, which provides that it should be "*liberally* construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Historical Notes, *supra*, foll. Cal. Const., art. XIII C, § 1, p. 85, italics added.) In any case, as we have discussed, even under the reasoning of the cases decided under Proposition 13, we conclude that the Fee is a special tax.

■ Our conclusion is bolstered by the treatment of a state surcharge authorized by the Emergency Telephone Users Surcharge Act (Rev. & Tax. Code, § 41001 et seq.). This legislation, enacted in 1976, imposes on telephone users a surcharge to fund state and local agencies' costs associated with providing and administering 911 service, including installation and ongoing expenses of providing a 911 emergency phone number system. (*Id.*, §§ 41020, 41136, 41150.)[12] The act defines the surcharge as "a tax levied by this state." (*Id.*, § 41013.) Although the City has chosen to provide enhanced services rather than a basic system, the Fee effectively does what the surcharge does—provides revenues to fund a governmental service available to all.

Accordingly, we conclude the trial court was correct in granting summary adjudication to plaintiffs on their cause of action.

## C. *The City's Motion for Summary Adjudication*

The City moved for summary adjudication on plaintiffs' first, second, and third causes of action. Each of these causes of action alleged that the Fee violated Proposition 218. The trial court denied the City's motion not on the merits, but on the procedural ground that the separate statement of undisputed material facts did not comply with rule 3.1350. The City contends the trial court abused its discretion in refusing to consider its motion on the merits.

---

[12] Revenue and Taxation Code section 41020, subdivision (a) imposes a surcharge "on amounts paid by every person in the state for intrastate telephone communication service in this state . . . ." Revenues generated by the surcharge are to be used, among other things, to pay refunds authorized by the Emergency Telephone Users Surcharge Act; to pay the State Board of Equalization for the cost of administering the act; to pay the Department of General Services for its costs in administering the 911 emergency telephone number system; and to pay for the installation of, and ongoing expenses for, communication services supplied to local agencies, including a basic system, a basic system with telephone central office identification, a system employing automatic call routing, and approved incremental costs. (Rev. & Tax. Code, § 41136.)

We have already concluded the trial court was correct when it ruled that plaintiffs were entitled to summary adjudication in their favor on the first cause of action. After the court made its ruling, the trial court dismissed the remaining causes of action at plaintiffs' request and entered judgment in plaintiffs' favor. In the circumstances, no decision we make on this procedural issue would affect the outcome of the case, and we need not consider it. (See *Giles v. Horn* (2002) 100 Cal.App.4th 206, 226–227 [123 Cal.Rptr.2d 735].)

## III. DISPOSITION

The judgment is affirmed.

Ruvolo, P. J., and Sepulveda, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 13, 2008, S164219. Baxter, J., Werdegar, J., and Corrigan, J., did not participate therein.