Filed 8/8/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MICHAEL JOHNSON et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF MENDOCINO, <br><br>     Defendant and Respondent. | A152004 <br><br> (Mendocino County <br> Super. Ct. No. SCUK CVG 17-68711) |

This appeal arises out of a challenge to the validity of a Mendocino County ballot measure, Measure AI, which imposed a tax on commercial cannabis businesses (Mendocino County Code, § 6.32.010 et seq.) and which was approved by a simple majority of county voters. Michael Johnson, Pebbles Trippet, Terry Johnson, Noel Manners, Paula Deeter, Ron Edwards, and Ralf Laguna (plaintiffs) appeal the trial court's order of dismissal after the court sustained the demurrer of the County of Mendocino (County) without leave to amend and denied plaintiffs' motion for a preliminary injunction. Plaintiffs contend that under a correct interpretation of article XIII of the California Constitution (article XIII), the tax imposed pursuant to Measure AI was not a general tax but, together with a related advisory measure, amounted to a special tax requiring approval by a supermajority of county voters. In the alternative, plaintiffs contend Measure AI did not involve a tax at all, and instead imposed an unlawful fee. We shall affirm the court's order of dismissal.

**PROCEDURAL BACKGROUND**

On February 6, 2017, plaintiffs filed a complaint against the County, requesting declarations that (1) the tax proposed by Measure AI was a special tax subject to article XIII C's supermajority vote requirement; (2) because the proposed tax increase received

1

less than two-thirds voter approval, it was defeated; and (3) that measures like Measure AI and its companion advisory measure, Measure AJ, are schemes meant to circumvent the California Constitution's supermajority requirements.

On March 23, 2017, the County filed a demurrer to plaintiffs' complaint.

On April 3, 2107, plaintiffs filed a motion for preliminary injunction.

On June 29, 2017, following a hearing, the court sustained the demurrer without leave to amend and denied plaintiffs' motion for a preliminary injunction.

On July 20, 2017, the court entered an order of dismissal.

On July 24, 2017, plaintiffs filed a notice of appeal.

On December 7, 2017, we granted the unopposed application of Howard Jarvis Taxpayers Association (HJTA) for leave to file an amicus curiae brief in support of plaintiffs' position.[1]

## DISCUSSION

### I. *Background*

#### A. *Ballot Measures AI and AJ*

Measures AI and AJ appeared on the November 8, 2016 ballot in Mendocino County. Measure AI was approved by 63.04 percent of the voters and Measure AJ was approved by 86.54 percent of the voters. We briefly summarize the measures' provisions and related information contained in the Sample Ballot and Voter Information Pamphlet (Pamphlet).

#### 1. *Measure AI*

The text of Measure AI in the Pamphlet provided: "Shall Chapter 6.32 be added to the Mendocino County Code, placing a business tax on cannabis cultivation and

---

[1] On November 22, 2017, we granted the County's unopposed request for judicial notice of the Sample Ballot and Voter Information Pamphlet for the November 2016 Mendocino County election, the full text of Mendocino County Ordinance No. 4361 (Cannabis Business Tax), the text of the official ballot pamphlet for Proposition 218, and the final vote totals on Measure AI and Measure AJ from the November 2016 Mendocino County election. (See Evid. Code, §§ 452, 459.)

dispensaries (not to exceed 10% of gross receipts) and cannabis distribution, delivery, manufacturing, nurseries, testing laboratories and transportation businesses ($2,500.00 per year, to be adjusted in accordance with Consumer Price Index increases) of medical and nonmedical cannabis where legalized by state law, potentially generating millions of dollars annually to help fund County services?"[2]

The Impartial Analysis of Measure AI in the Pamphlet described the measure as "a general tax," placed on the ballot by the Board of Supervisors, which must be adopted by a majority of the voters.

The argument in favor of Measure AI stated, inter alia: "A 'YES' vote will make marijuana businesses operating in the unincorporated areas of Mendocino County pay their fair share to support County services." The proponents further argued that the measure "protects the environment and requires marijuana businesses to pay long overdue funding to support general County services, including public health, public safety, and environmental cleanup. . . . [¶] . . . [¶] A 'YES' vote on Measure AJ (the companion advisory measure) will tell the Board of Supervisors that you want a majority of the proceeds from the 'Marijuana Tax' to be spent for Marijuana Enforcement, Mental Health Services, Repair of County Roads, and Fire and Emergency Medical Services. [¶] Vote 'YES' on Measure AI . . . to restore tax fairness and fund County services."

No argument against Measure AI was submitted.

### 2. *Measure AJ*

The text of Measure AJ in the Pamphlet provided: "Advisory Vote Only. If Mendocino County adopts business license taxes on cannabis businesses by the adoption of the measure adopting Chapter 6.32, Measure <u>AI</u>, should the County use the majority of

---

[2] The ordinance itself provides: "The Cannabis Business Tax is enacted solely for general governmental purposes for the County and not for specific purposes. All of the proceeds from the tax imposed by this Chapter shall be placed in the County's general fund and used for purposes consistent with general fund expenditures of the County." (Mendocino County Code, § 6.32.020.)

that revenue for funding enforcement of marijuana regulations, enhanced mental health services, repair of county roads, and increased fire and emergency medical services?"

The "Impartial Analysis" of Measure AJ stated, inter alia: "The Elections Code provides that a county may seek an advisory measure to allow voters to voice their approval or disapproval of a ballot proposal. This ballot measure seeks voter approval for spending the general tax dollars that would be generated if the voters approve Measure AI, as proposed by the Board of Supervisors. Measure AI is a general tax . . . . [¶] If the voters approve Measure AJ, it would serve to advise the Board of Supervisors that the voters want a majority of the revenue generated by the Cannabis Business Tax, Measure AI, for enforcement of marijuana regulations, enhanced mental health services, repair of county roads, and increased fire and emergency services. [¶] This is an advisory vote only. The results of this advisory vote will in no manner be controlling of the Board of Supervisors."

The argument in favor of Measure AJ stated, inter alia: "Measure AJ is your opportunity to tell the Board of Supervisors how you want proceeds from Measure AI, the 'Marijuana Tax,' to be spent. [¶] . . . . The 'Marijuana Tax' is a general tax and can be spent for general county government purposes. [¶] Measure AJ asks the voters if they want a majority of revenue from the 'Marijuana Tax' to be spent for the following services: [marijuana enforcement, mental health, county road repair, and fire and emergency medical services]. [¶] . . . [¶] Vote 'YES' on Measure AJ. Tell this and future Boards of Supervisors to spend the 'Marijuana Tax' money to pay for critical County services."

No argument against Measure AJ was submitted.

### B. *Trial Court's Ruling on the County's Demurrer*

In granting the County's demurrer without leave to amend, the trial court rejected plaintiffs' argument that the passage of Measure AI by a simple majority of voters was insufficient under article XIII C because the purported general tax proposed in Measure AI was transformed into a special tax with special purposes by the presence of Measure AJ, the companion advisory measure.

4

Specifically, the court found that the language of Measure AI made clear "that the tax was designed as a general tax and not a special tax. There is nothing in the ordinance that requires the Board of Supervisors to make specific expenditures with the tax revenue. [¶] The advisory measure [Measure AJ] adopted by the voters is just that, advisory. Advisory measures, even those related to the expenditure of tax revenues, are permissive under the law and merely allow the legislative body to poll it[s] constituents without enacting any law. The legislative body is not bound by such advisory measures. [Citing *Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486 and *Coleman v. City of Santa Clara* (1998) 64 Cal.App.4th 662.] [¶] Plaintiffs have offered no authority to support their contention that the business tax ordinance adopted by a majority of the voters would have required a supermajority vote."

The court also found that plaintiffs' references to certain provisions of Proposition 26 "reflect[ed] a complete misunderstanding as to its meaning and application to this case. There is no dispute that fees adopted by the legislative body must be reasonably related to the services provided. In this case, plaintiffs are not challenging an adoption of a fee; they are objecting to the imposition of a tax. The provision of Proposition 26 referenced in plaintiffs' moving papers has no bearing on the adoption of a tax."

Finally, because plaintiffs had "conceded that there are no contested facts in this case" and because their "interpretation of the ordinance is not supported by any legal theory[,] leave to amend would be futile." The court also denied plaintiffs' motion for a preliminary injunction.

## II. *Standard of Review*

"An appellate court must independently decide questions of law without deference to the trial court's conclusions. [Citation.] A demurrer tests only the sufficiency of the pleadings and, as such, raises only a question of law. [Citation.] Also, a dispute over the meaning of a constitutional provision presents a question of law. [Citation.]" (*Neilson v. City of California City* (2005) 133 Cal.App.4th 1296, 1304-1305 (*Neilson*).)

"In reviewing a demurrer that is sustained without leave to amend, an appellate court assumes the truth of (1) all facts properly pleaded by the plaintiff, (2) all facts

5

contained in exhibits to the complaint, (3) all facts that are properly the subject of judicial notice, and (4) all facts that reasonably may be inferred from the foregoing facts. [Citations.]  The reviewing court does not assume the truth of contentions, deductions or conclusions of law.  [Citation.]

"The reviewing court must reverse the judgment if (1) the complaint, liberally construed, has stated a cause of action under any possible legal theory; or (2) the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment.  [Citations.]  The burden of proving a reasonable possibility of cure is squarely on the plaintiff.  [Citation.]"  (*Neilson*, *supra*, 133 Cal.App.4th at p. 1305.)

### III.  *Measure AI is Not a Special Tax*

#### A.  *Legal Background*

In 1978, California voters passed Proposition 13, which limited the ability of local governments to raise taxes.  Proposition 13, which added article XIII A to the California Constitution, included the following provision:  "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."  (Art. XIII A, § 4.)

In *City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 51 (*Farrell*), the California Supreme Court found that a payroll and gross receipts tax, the proceeds of which were placed in the city's general fund to be used for general governmental expenditures, was not a special tax.  The court "construe[d] the term 'special taxes' in [article XIII A,] section 4 to mean taxes which are levied for a specific purpose rather than, as in [that] case, a levy placed in the general fund to be utilized for general governmental purposes . . . ."  (*Farrell*, at p. 57.)

In 1986, California voters approved Proposition 62, which added Government Code sections 53720 through 53730.  Government Code section 53721 provides:  "All taxes are either special taxes or general taxes.  General taxes are taxes imposed for general governmental purposes.  Special taxes are taxes imposed for specific purposes."  Government Code section 53722 provides that local government may not impose a

6

special tax unless the tax is submitted to the electorate and passed by two-thirds of voters. Under Government Code section 53723, a general tax may not be imposed unless the tax is submitted to the electorate and is passed by a majority vote.

In 1991, our Supreme Court decided *Rider v. County of San Diego* (1991) 1 Cal.4th 1 (*Rider*), which addressed the question of what constitutes a "special tax" and a "special district" for purposes of article XIII A, section 4. The court held that a tax imposed by a special, limited purpose agency, the proceeds of which were deposited into that agency's general fund, was a special tax. (*Rider*, at pp. 14-15.) The *Rider* court concluded the "reasonable interpretation of section 4, consistent with *Farrell's . . .* guidelines, is that a 'special tax' is one levied to fund a specific governmental project or program . . . . It is true that, under the foregoing principle, *every* tax levied by a 'special purpose' district or agency would be deemed a 'special tax.' But this interpretation seems most consistent with the probable intent of the framers of Proposition 13." (*Rider*, at p. 15.)

In *Neecke v. City of Mill Valley* (1995) 39 Cal.App.4th 946, 956 (*Neecke*), a panel of this Division summarized: "The essence of a special tax, as explained *both* in *Farrell* and *Rider*, is that its proceeds are earmarked or dedicated in some manner to a specific project or projects." We distinguished the situation in *Rider* from those in which tax proceeds are "placed in a city's general fund, [are] available for use for any of the city's legitimate functions and allocated during the general budgeting process in light of changing priorities and conditions." (*Neecke*, at p. 956.) In such circumstances, "there is no certainty that tax proceeds deposited in the general fund will be used for any specific project, although such a result indeed may have been the intention of the officials enacting the tax in question. [Citation.]" (*Ibid.*)

We also rejected the plaintiff's claim that a court is required to "ascertain whether a tax, the proceeds of which are deposited into a city's general fund, was enacted in order to circumvent Proposition 13 and then (if the court concludes that it was) to invalidate the tax. The *Farrell* court was aware of the potential that its decision provided for cities to compensate for Proposition 13's limitation on property taxes by enacting 'general fund

7

taxes.' [Citations.]" (*Neecke*, *supra*, 39 Cal.App.4th at p. 958.) We further explained that to accept the plaintiff's claim "would violate the well-established rule that, except in certain 'rare circumstances' [citation], '. . . the validity of legislative acts must be measured by the terms of the legislation itself, and not by the motives of, or influences upon, the legislators who enacted the measure.' [Citations.]" (*Ibid.*)

A few years later, in *Coleman*, *supra*, 64 Cal.App.4th 662, the Sixth District Court of Appeal addressed a factual scenario nearly identical to the present one, involving two county ballot measures: Measure B, passed by a majority of voters, increased a county sales tax to be used "for general county purposes," while Measure A, passed by a supermajority, was an advisory measure stating the intent of the county's voters that, inter alia, any new sales tax funds be spent on certain transportation improvements. (*Coleman*, at pp. 665-667, 671.) The appellate court rejected the plaintiffs' claims "that Measures A and B were designed to circumvent supermajority voter approval requirements" and "that because the measures were inseparably linked, Measure B became a 'special tax,' " which was invalid because not approved by a supermajority of the voters. (*Coleman*, at pp. 667, 670.) The court agreed with our conclusion in *Neecke* that where a local government imposes a tax and the revenue from the tax goes into a general fund, available for general governmental purposes, under *Farrell*, the tax is a general tax. (*Coleman*, at pp. 669-670.) The court noted that the ballot pamphlet and arguments in favor of Measure B made clear that the "tax revenue would go into the general fund and be available for *any* county purpose without legal restriction." (*Coleman*, at p. 670.)

The court in *Coleman* stated that the two ballot measures were obviously "closely related to each other: One increased the sales tax; the other expressed the voters' preference for how new tax revenue should be spent. This relationship, however, does not reflect such inseparability that as a matter of law the two measures must be considered as one. On the contrary, the measures were not legally connected. The spending priorities in Measure A were not compulsory. The County was free to spend Measure B revenue on any and all County purposes without restriction. And the validity

8

of neither measure was dependent on passage of the other." (*Coleman*, *supra*, 64 Cal.App.4th at p. 670.)

Finally, the *Coleman* court adopted our conclusion in *Neecke* that courts generally "must determine the validity of legislation by its own terms and not the motives of, or influences upon, the legislators who enacted it." (*Coleman*, *supra*, 64 Cal.App.4th at p. 672.) The court found it "irrational to subject two identical 'general fund' tax measures to different voter approval requirements because, in proposing them, elected city or county officials had specific projects in mind for one but not the other." (*Ibid*.) The court did "acknowledge that as a result of our decision, ballot bifurcation makes it possible for cities and counties to raise new tax revenue by simple majority and then spend it on a specific list of projects. However, we do not believe that such bifurcation, like the creation of new districts discussed in *Rider*, represents a means to circumvent supermajority requirements. This is so because Propositions 13 and 62 were not intended to make it more difficult to raise *all* new taxes, only those that are legally earmarked for specific purposes." (*Coleman*, at pp. 672-673.)

In November 1996, California voters approved Proposition 218, which added articles XIII C and XIII D to the California Constitution. The "Findings and Declarations" section of Proposition 218 provided: "The people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases. However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent."[3]

---

[3] In the sample ballot for Proposition 218, the legislative analyst's brief analysis of Proposition 218's effect on local taxes was as follows:

"**Taxes**

9

Article XIII C distinguishes between a "general tax," defined as "any tax imposed for general governmental purposes" and a "special tax," defined as "any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund." (Art. XIII C, § 1, subds. (a) & (d).) A general tax requires approval by a majority of the electorate. (Art. XIII C, § 2, subd. (b).) A special tax requires approval by two-thirds of the electorate. (Art. XIII C, § 2, subd. (d).) Proposition 218 thus added language to the California Constitution not contained in Proposition 62, indicating that a "special tax" includes "a tax imposed for specific purposes, which is placed into a general fund." (Art. XIII C, § 1, subd. (d).)

After the passage of Proposition 218, " '[a] tax is general only when its revenues are placed into the general fund and are available for expenditure for any and all governmental purposes. [Citation.]' [Citation.]" (*Building Industry Assn. of Bay Area v. City of San Ramon* (2016) 4 Cal.App.5th 62, 86 (*Building Industry*); accord, *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2003) 106 Cal.App.4th 1178, 1185.)

---

"***Current Practice.*** Local governments typically use taxes to pay for general government programs, such as police and fire services. Taxes are 'general' if their revenues can be used to pay for many government programs, rather than being reserved for specific programs. Proposition 62—a statutory measure approved by the voters in 1986—requires new local general taxes to be approved by a majority vote of the people. Currently, there are lawsuits pending as to whether this provision applies to cities that have adopted a local charter, such as Los Angeles, Long Beach, Sacramento, San Jose, and many others.

"***Proposed Requirements for Taxes***. The measure states that all *future* local general taxes, including those in cities with charters, must be approved by a majority vote of the people. The measure also requires *existing* local general taxes established after December 31, 1994, without a vote of the people to be placed before the voters within two years." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) analysis of Prop. 218 by Legis. Analyst, pp. 3-4.)

In addition, section 5 of Proposition 218 provided that "[t]he provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent."

## B. *Legal Analysis*

In the present case, plaintiffs argue that the language Proposition 218 added to the definition of "special tax"—i.e., "any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund" (art. XIII C, § 1, subd. (d))—supersedes Proposition 62 and, consequently, the holding in *Coleman* (which, though decided in 1998, addressed a tax imposed before passage of Proposition 218). According to plaintiffs, this new definition of special tax applies to Measure AI because, through the use of an advisory measure, the voters in fact enacted a tax that was placed in the general fund, but was imposed for the specific purposes set forth in Measure AJ.[4] We disagree.

First, the "essence" of a special tax remains the same after the passage of Proposition 218:  a tax is "special" when " 'its proceeds are earmarked or dedicated in some manner to a specific project or projects.'  [Citation.]" (*Bay Area Cellular Telephone Co. v. City of Union City* (2008) 162 Cal.App.4th 686, 696 (*Bay Area Cellular*), citing *Neecke*, *supra*, 39 Cal.App.4th at p. 956.)  Proposition 218 simply clarified that this rule applies even when the tax's proceeds are placed into a general fund.  (Art. XIII C, § 1, subd. (d).)  Consequently, after the passage of Proposition 218, the holdings in *Neecke* and *Coleman* remain the law:  Under *Farrell*, *supra*, 32 Cal.3d 47, when a tax is imposed by a general governmental entity such as a county and the revenue from that tax goes into a general fund *for general governmental purposes*, the tax is a

---

[4] Plaintiffs seem to misunderstand the basic definition of "special purposes" in Proposition 218 when they also assert in their opening brief, without any legal support, that the ordinance approved by Measure AI "defines its specific purpose as imposing 'a tax on the privilege of cultivating dispensing, producing, [etc.] medical cannabis products.' " (Quoting Mendocino County Code, § 6.32.030.)  The relevant definition of "special purposes," however, relates to the particular projects to which the tax revenue is dedicated, not the category of people on whom the tax is imposed. (See Art. XIII C, § 1, subd. (d); *Neecke*, *supra*, 39 Cal.App.4th at p. 956.)

11

general tax. (*Coleman*, *supra*, 64 Cal.App.4th at pp. 669-670; *Neecke*, *supra*, 39 Cal.App.4th at p. 956; see *Building Industry*, *supra*, 4 Cal.App.5th at p. 86.)[5]

Here, the language of Measure AI and related materials in the Pamphlet clearly and repeatedly informed the electorate that the proposed tax was intended for general county purposes. The measure asked voters whether a tax on cannabis businesses should be imposed, which would "potentially generat[e] millions of dollars annually to help fund County services." Not only did the "Impartial Analysis" in the Pamphlet describe the proposed tax as a "general tax," the argument in favor of the measure stated that it would require "marijuana businesses to pay long overdue funding *to support general County services, including* public health, public safety, and environmental cleanup." (Italics added.) Thus, while the ballot argument listed some of the general services that could be funded, none of the funds were "earmarked or dedicated" to any specific project, but instead were intended to provide funding for *general* county services. (*Bay Area Cellular*, *supra*, 162 Cal.App.4th at p. 696; accord, *Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 130, fn. 13 [ballot summary of measure in question, which stated that "the tax would fund 'essential services, *including* sheriff's deputies, parks libraries, street repairs, and *other general fund services*,' " did not change nature of tax from a general to a special tax].)

Second, contrary to plaintiffs' and amicus curiae HJTA's claim, the inclusion of companion Measure AJ on the ballot with Measure AI does not alter the fact that Measure AI proposed a general tax. HJTA asserts that "it is clear that Proposition 218's expanded definition of 'special tax' is intended to capture schemes like the County's

---

[5] Although we believe the language of Proposition 218 makes its meaning clear (see *Neilson*, *supra*, 133 Cal.App.4th at p. 1305 [only if language of constitutional provision is ambiguous do we consider extrinsic evidence of enacting body's intent]), we do note that *nothing* in the ballot pamphlet for Proposition 218, including the arguments for and against the proposition, indicates any intent to change the existing definition of special and general taxes, beyond the clarification that special taxes include tax proceeds deposited into the general fund if imposed for a specific purpose. (See art. XIII C, § 1; compare Gov. Code, § 53721.)

12

here, where through an 'advisory' measure, the County indicates to voters the 'specific purposes' of a tax that will be 'placed into a general fund.' ([A]rt. XIII C, § 1[, subd.] (d).)" HJTA cites in support of this claim cases stating that Proposition 218 was enacted " 'to close government-devised loopholes in Proposition 13' " and " 'to reform the law governing local government's imposition of revenue generating devices *other* than special taxes.' " (*Moore v. City of Lemon Grove* (2015) 237 Cal.App.4th 363, 367-368, quoting *City of San Diego v. Shapiro* (2014) 228 Cal.App.4th 756, 761, 779.)

The text of Measure AJ, however, plainly stated at the outset that it was an "[a]dvisory vote only." The Impartial Analysis informed voters that this advisory measure "would serve to advise the Board of Supervisors that the voters want a majority of the revenue generated by" Measure AI to be spent in certain ways, but also that "[t]his is an advisory vote only. The results of this vote will in no manner be controlling of the Board of Supervisors." In addition, the argument in favor of Measure AJ told voters that this was their opportunity to tell the Board of Supervisors how they wanted Measure AI proceeds to be spent, but that Measure AI "is a general tax and can be spent for general county government purposes."

The two companion measures in this case, like those discussed in *Coleman*, were "closely related to each other[.] This relationship, however, does not reflect such inseparability that as a matter of law the two measures must be considered as one," given that the "County was free to spend [the revenue from the non-advisory measure] on any and all County purposes without restriction." (*Coleman*, *supra*, 64 Cal.App.4th at p. 670; see also Elec. Code, § 9603, subd. (c) [authorizing local governments to hold an advisory vote, which is "an indication of general voter opinion" regarding a particular ballot proposal, the results of which are "in no manner . . . controlling on the sponsoring legislative body"]; cf. *Howard Jarvis Taxpayers Assn. v Padilla*, *supra*, 62 Cal.4th at p. 524 ["legislative authority to pose advisory ballot questions has long been properly employed—by our own Legislature, by the legislatures of numerous other states, and by local legislative bodies (such as county boards of supervisors and city councils) throughout California and the nation—to obtain the views of the voters concerning *all*

13

manner of subjects reasonably within a legislative body's authority to act"] (conc. opn. of Cantil-Sakauye, C.J.).)

Hence, because Measure AJ did not in any way limit the County's ability to spend the proceeds collected under Measure AI, the tax necessarily and by its terms remained a general tax. (See *Coleman*, *supra*, 64 Cal.App.4th at p. 670; see also *Howard Jarvis Taxpayers Assn. v. City of Roseville*, *supra*, 106 Cal.App.4th at p. 1187 ["We are not at liberty to ignore the unambiguous language of either Proposition 218 or [the ballot measure at issue]"].)

Moreover, to accept plaintiffs' and HJTA's claim that the County improperly used Measure AJ to avoid the supermajority vote required on a special tax would, as the *Neecke* and *Coleman* courts explained, "violate the well-established rule that, except in certain 'rare circumstances' [citation], '. . . the validity of legislative acts must be measured by the terms of the legislation itself, and not by the motives of, or influences upon, the legislators who enacted the measure. [Citations.]" (*Neecke*, *supra*, 39 Cal.App.4th at p. 958; accord, *Coleman*, *supra*, 64 Cal.App.4th at p. 672.)[6]

---

[6] We likewise find unpersuasive HJTA's argument that "Proposition 218's expanded definition of 'special tax' would be nonsensical if not applied to an advisory measure specifying the use of a tax placed into the general fund. For there is no other way a tax 'placed into a general fund' can be 'imposed for specific purposes' [Citation.]" Again, HJTA's argument would require us to improperly go beyond "the terms of the legislation itself" and related legislative materials and attempt to infer "the motives of, or influences upon the legislators who enacted the measure." (*Neecke*, *supra*, 39 Cal.4th at p. 958.) For the same reason, we will not consider the County's position that a more natural reading of article XIII, section 1, subdivision (d) is that it was written "as a safeguard against the sort of scheme at issue in *Rider* [i.e., the creation of a special district that deposited tax revenue in a 'general' fund, to be used only for the specific purposes of that special district], or similar attempts to subvert the 'general fund' rule. . . . By providing that a tax imposed for a specific purpose is a special tax, even if its revenues are placed in the general fund, this language cemented the holding of *Rider* and prevented similarly creative schemes restricting the expenditure of tax revenues placed into a general fund." (See *Neecke*, *supra*, 39 Cal.App.4th at p. 958; accord, *Coleman*, *supra*, 64 Cal.App.4th at p. 672.)

14

For this reason, we deny HJTA's request that we take judicial notice of an article published by the California Taxpayers Association, in which Jonathan Coupal, on behalf of HJTA and as the author of Proposition 218, purportedly "explain[s] the drafters' intent underlying certain key provisions of Proposition 218." According to HJTA, we should take judicial notice of this article, "not for the truth of its statements, but merely because it asserts the drafters' intent. (Evid. Code, § 452, subd. (h) (facts not reasonably subject to dispute).)" This article was published some three months after Proposition 218 was enacted, and the author's comments regarding the ostensible purpose of the proposition and its effect on advisory measures were not included in any of the information materials provided to voters. As Division Five of this District stated in *People ex rel. Lungren v. Peron* (1997) 59 Cal.App.4th 1383, 1398, fn. 10, in rejecting a party's request to allow the lay drafter of Proposition 215 to present evidence of his intention when he drafted the initiative: "[T]he drafter's secret intentions, not communicated to the voters, are not legally relevant in determining the intention of the voters in passing [an] initiative. . . . We cannot add to the initiative a [new provision], in the guise of legal interpretation or based upon the drafters' private intentions." Because it cannot be argued that the article in question demonstrates voter intent, it is irrelevant to the issue before us. We therefore deny the request for judicial notice.

In sum, Proposition 218 did not alter the definition of a general tax. A tax is general "when its revenues are placed into the general fund and are available for expenditure for any and all governmental purposes. [Citation.]' [Citation.]" (*Building Industry*, *supra*, 4 Cal.App.5th at p. 86; accord, *Howard Jarvis Taxpayers Assn. v. City of Roseville*, *supra*, 106 Cal.App.4th at p. 1185.) For all of the reasons previously discussed, plaintiffs cannot show that Measure AI is a special tax masquerading as a

---

Regardless of any theories about the intent of the drafters of Proposition 218, what the initiative and related ballot materials did *not* indicate was any intent to turn an advisory measure into a binding law setting forth the special purposes for which a general purpose tax proposed in another measure will be used.

15

general tax, deposited into the general fund but "imposed for specific purposes" (art. XIII C, § 1, subd. (d)), thereby requiring the approval of a two-thirds majority of the voters. Instead, the measure, by its terms, fits squarely within the definition of a general tax. (See *Farrell*, *supra*, 32 Cal.3d at p. 57; *Building Industry*, at p. 86; *Howard Jarvis Taxpayers Assn.*, at p. 1185.)[7]  The trial court therefore properly sustained the County's demurrer without leave to amend.  (See *Neilson*, *supra*, 133 Cal.App.4th at p. 1305.)

---

[7] We also find meritless plaintiffs' additional contentions that Measure AI was a "sin tax" and that it violated equal protection.  Plaintiffs provide no legal authority in support of the sin tax claim, merely asserting that Measure AI proposed a "special sin tax," which was not approved by a supermajority of the voters.  We decline to address this unsupported contention.  (See, e.g., *County of Butte v. Emergency Medical Services Authority* (2010) 187 Cal.App.4th 1175, 1196, fn. 7; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546; see also Cal. Rules of Court, rule 8.204(a)(1)(B).)

As to the contention that Measure AI violates equal protection, a claim not raised in the trial court, plaintiffs make the bare—and somewhat incomprehensible—argument that Measures AI and AJ amount to "defamatory allegations of a community of now-legal cannabis farmers and distributors [*sic*] that has no rational basis in the evidence before the court."  They then assert that the County "has shown no reasonable basis for imposing the Medical Cannabis Business Tax on certain legal businesses and farmers while exempting all others; they have shown no basis whatsoever.  That is both arbitrary and grossly unfair."  (Citing *Pennell v. City of San Jose* (1986) 42 Cal.3d 365, 374; *Department of Mental Hygiene v. Kirchner* (1964) 60 Cal.2d 716, 719-720, judg. vacated and cause remanded by *Department of Mental Hygiene v. Kirchner* (1965) 380 U.S. 194, 200.)

"[T]he threshold for tax legislation to pass constitutional muster against an equal protection challenge is very low.  'The party who challenges the constitutionality of a classification in a tax statute bears a very heavy burden; it must negate any conceivable basis [that] might support the classification.' [Citation.]" (*Borikas v. Alameda Unified School Dist.* (2013) 214 Cal.App.4th 135, 149; see also *California Assn. of Retail Tobacconists v. State of California* (2003) 109 Cal.App.4th 792, 844 [" 'neither due process nor equal protection imposes a rigid rule of equality in tax legislation' " and "[i]nequalities, which arise from the singling out of one particular class for taxation or exemption, infringe no constitutional limitation"].)  Here, plaintiffs have failed to provide any viable legal argument demonstrating a reasonable possibility that they could cure the defects in the complaint if permitted to amend to add an equal protection cause of action. (See *Neilson*, *supra*, 133 Cal.App.4th at p. 1305 [burden of proving reasonable possibility that defect in complaint can be cured by amendment "is squarely on the plaintiff"] &

16

## IV. *Measure AI is Not a Fee*

In the alternative, plaintiffs contend the tax imposed by Measure AI "is not a tax but is an illegal 'fee' imposed on legal medical cannabis businesses in the guise of a 'general tax,' solely for the County-licensed 'privilege' of conducting a legal cannabis business." According to plaintiffs, this disguised fee "was never justified and calculated as a proportionate fee related to actual County costs." Plaintiffs also claim the court improperly failed to place the burden of proof on the County to demonstrate that the so-called tax was not in fact a fee.

Plaintiffs rely for this argument on Proposition 26, which was approved by the voters in November 2010, and which amended section 3 of article XIII A to limit the ability of local governments to avoid the voting requirements for new taxes by calling such taxes fees. Proposition 26's "Findings and Declarations of Purpose" provided in relevant part:

"(e) [The post-Propositions 13 and 218] escalation in taxation does not account for the recent phenomenon whereby the Legislature and local governments have disguised new taxes as 'fees' in order to extract even more revenue from California taxpayers without having to abide by these constitutional voting requirements. . . .

"(f) In order to ensure the effectiveness of these constitutional limitations, this measure also defines a 'tax' for state and local purposes so that neither the Legislature nor local governments can circumvent these restrictions on increasing taxes by simply defining new or expanded taxes as 'fees.' "

Proposition 26 also amended section 1 of article XIII C to define a "tax" as "any levy, charge, or exaction of any kind imposed by a local government," except when specific exceptions apply, and to provide that "[t]he local government bears the burden of

---

p. 1312 [plaintiff's "mere unsupported assertion that this tax is a sham" was not sufficient to overcome city's demurrer, and plaintiff had suggested "no way in which he could improve his pleading"].)

17

proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax . . . ." (Art. XIII C, § 1, subd. (e)(7).)

Proposition 26 thus addressed the problem of state and local governments disguising taxes as fees, with the burden on the government to prove that the so-called fee is not in fact a tax. Here, the County never claimed that Measure AI, which by its terms imposed a tax, was anything other than a tax. We agree with the trial court that plaintiffs' reliance on Proposition 26 "reflects a complete misunderstanding as to its meaning and application to this case."

## DISPOSITION

The order of dismissal is affirmed. Costs on appeal are awarded to the County.

                         _____

                         Kline, P.J.

We concur:


_____

Stewart, J.


_____

Miller, J.

*Johnson et al. v. County of Mendocino* (A152004)

19

Trial Judge:                              Hon. Jeanine B. Nadel


Trial Court:                              Mendocino County Superior Court


Attorney for Appellants:                  Lawrence Elliot Rosen

Attorneys for Amicus Curiae:              Jonathan M. Coupal
                                          Trevor A. Grimm
                                          Timothy A. Bittle
                                          Laura E. Murray


Attorneys for Respondent:                 Office of the County Counsel
                                          Katharine L. Elliott, County Counsel
                                          Christian M. Curtis, Chief Deputy