Filed 7/22/21  Howard Jarvis Taxpayers Assn. v. County of Yuba CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| HOWARD JARVIS TAXPAYERS ASSOCIATION et al., | C090473 |
| Plaintiffs and Respondents, | (Super. Ct. No. CVPT1802127) |
| v. | |
| COUNTY OF YUBA et al., | |
| Defendants and Appellants. | |

Defendants and appellants County of Yuba and the Yuba County Board of Supervisors (collectively, County) appeal a decision by the trial court that Measure K, a sales tax ordinance approved by a majority of voters, was not a general tax but a special tax requiring a two-thirds vote under article XIII C, section 2, of the California Constitution.  Measure K added to the county code the "Public Safety/Essential Services Protection Ordinance," imposing a 1 percent retail sales tax in unincorporated areas of the county.  Plaintiffs and respondents Howard Jarvis Taxpayers Association, Charlie Mathews and John Mistler (collectively, HJTA) successfully challenged this provision in

1

a reverse validation and declaratory relief action alleging the ordinance was invalid because Measure K proposed a special tax requiring approval by two-thirds of the electorate.

"The essence of a special tax . . . is that its proceeds are earmarked or dedicated in some manner to a specific project or projects." (*Neecke v. City of Mill Valley* (1995) 39 Cal.App.4th 946, 956 (*Neecke*); *Johnson v. County of Mendocino* (2018) 25 Cal.App.5th 1017, 1025 (*Johnson*); Gov. Code, § 53721 ["Special taxes are taxes imposed for specific purposes"].) On appeal, the County contends Measure K proposed a general tax for "[g]eneral fund services like police, fire protection, administrative and social services, and economic development . . . ." HJTA responds that Measure K proposed a special tax for the " 'specified purposes' of funding county 'public safety services' and 'essential services.' "

We agree with the County. The terms "public safety services" and "essential services" do not constitute earmarks for specified projects. The judgment is reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 6, 2018, Measure K was submitted on the ballot and approved by 53 percent of voters. The ballot question was stated as follows: "YUBA COUNTY PUBLIC SAFETY/ESSENTIAL SERVICES PROTECTION MEASURE. To maintain and protect essential services such as 9-1-1 emergency medical/fire response; improving wildland fire containment; maintaining 24-hours sheriff's patrol; attracting/retaining jobs, businesses, and qualified sheriff deputies; and other essential services, shall the measure to establish a 1 cent sales tax of 10 years in unincorporated Yuba County, providing an estimated $4,300,000 annually requiring accountability, citizens' oversight/audits, and all revenue controlled locally, be adopted?"

The full text of the proposed ordinance was included in the ballot pamphlet. Section 5.60.160 of the ordinance headed the "Use of Sales Tax Proceeds" provides that "[t]he Public Safety/Essential Services Protection Ordinance will provide a secure, local

2

revenue stream to the County that shall be used entirely to maintain and improve public safety services and essential services for the benefit of the unincorporated areas of the County. All proceeds of the tax levied and imposed hereunder shall be accounted for and paid into a public safety/essential services trust fund or account designated for use by the County for such specified purposes."

Section 5.60.170 regarding "Accountability – Citizens' Oversight Committee" establishes a five-member committee of residents of the unincorporated areas of the county "to oversee revenues received by the County from the transactions and use taxes imposed pursuant to this ordinance, and to ensure that tax revenues are used by the County in a manner consistent with the voter approved measure adopting this ordinance." The committee is required to "review the revenue collected pursuant to this ordinance and provide an audit report on the use of that revenue to the Board of Supervisors at least annually . . . ."

"Impartial Analysis" by the county counsel included in the ballot materials stated that "[a]pproval of Measure K would allow the County of Yuba to impose and collect from the residents and citizens of unincorporated Yuba County a 1% retail sales tax for a period of 10 years for the purpose of providing additional funding for public safety and essential services." "The County has expressed its intent to spend [the tax revenue] on areas of public safety and essential protection services, including 9-1-1 response, wildland fire containment, 24-hour Sheriff's deputy patrols, and other essential services."

The argument in favor of Measure K in the ballot materials stated that the tax will: "Protect/maintain fire protection services [¶] Improve the ability to react to/contain wildland fires [¶] Maintain/improve emergency response times [¶] Maintain 24-hour sheriff's patrols [¶] Attract and retain businesses to the County." The proponents further argued that Measure K would improve response times by sheriff's deputies to 911 calls and stop gang members from selling hard drugs on the streets. The proponents also maintained that "Independent Citizen Oversight and financial audits will ensure the

3

money is spent as promised to voters." The proponents signing the argument in favor of Measure K included the current county sheriff, a retired county sheriff, the county district attorney, a fire protection district chief, and a wildland fire victim.

The argument against Measure K stated: "Measure K is not a sales tax for public safety. Not one dime is legally dedicated to this end. Proponents of the tax increase use public safety to garner sympathy of voters." The argument continued: "A Citizens Advisory Panel to oversee county spending has zero authority to direct tax dollars collected." The remainder of the argument contended that the county's budget shortfalls were attributable to "rising payroll, pension and health insurance costs of county employees and Supervisors" and the electorate's only recourse "is to stop giving politicians money where we can."

There was no rebuttal argument to the argument in favor of Measure K. The rebuttal to the argument against the measure listed a series of "facts": the state had endangered county residents by cutting funding to prosecute crimes; an independent report warned that without Measure K " 'essential law enforcement services are in jeopardy' " and response times to emergency calls are " 'in excess of 19 minutes, 90% of the time' "; the local economy suffers if the county is not safe; and Measure K is fiscally responsible because "[f]unding can only be spent locally on vital services like public safety." Proponents signing the rebuttal included a volunteer firefighter, a children's advocate, an economic development and local business advocate, a victim's rights advocate, and a taxpayer advocate and lifelong county resident. They urged: "Vote Yes on K - keep our communities safe, support volunteer firefighters, improve our local economy and make sure a sheriff's deputy, medical responder or firefighter can show up when you call!"

On December 21, 2018, HJTA filed a reverse validation action and a complaint for declaratory and injunctive relief contending the ordinance adopted by Measure K was invalid. The complaint named as defendants the County and the California Department

4

of Tax and Fee Administration (CDTFA), the state agency that administers sales taxes. On February 19, 2019, the County answered the complaint. On the same day, the CDTFA filed a demurrer. On February 21, 2019, HJTA filed a motion for preliminary injunction. On April 24, 2019, the trial court sustained the demurrer and dismissed CDTFA. On March 26, 2019, the court denied HJTA's motion for preliminary injunction.

The parties submitted briefs on the merits to the trial court. On August 27, 2019, the trial court heard oral argument and took the matter under submission.

On September 9, 2019, the court issued a statement of decision concluding that "Measure K proposed a special tax."

In the statement of decision, the court examined the question put to voters in the ballot materials and determined that it "clearly asks whether the voters are in favor of a tax to fund public safety services, giving specific examples. Public safety and essential services are made equivalent in status and meaning by this text." The court also quoted section 5.60.160, the "Use of Sales Tax Proceeds" provision of the ordinance. The court found that the "ordinary and common meaning of these two portions of the ballot is that the tax revenue is dedicated to specific purposes only and not for general government purposes. In fact, at no place in the ballot is the voter plainly informed that the revenue can be used for any and all purposes."

The trial court also cited the impartial analysis from county counsel, which the court said "unequivocally equates essential services to public safety." Further, the court noted that "the arguments in favor of the measure authored by public safety officials overwhelmingly advocate for public safety needs."

With respect to "economic development" included in "essential services," the court reasoned that "Measure K gives examples of what are traditional public safety/essential services and includes economic development (job and business attraction/retention) as an essential service. Economic development is essential to the

5

existence of all other government services and is undoubtedly benefitted by more public safety services."

In addition, the court noted that Measure K provides that tax revenues would be " 'accounted for and paid into a public safety services and essential services trust fund entirely' for 'such specified purposes.' " "This language assures voters that revenues will be spent exclusively on the specified purposes of public safety and economic development and not for anything in the budget."

Lastly, the court referred to "matters outside the ballot," including proceedings before the board of supervisors, which "discloses an overwhelming, almost exclusive, emphasis on the need for revenue from Measure K for public safety purposes. Ninety-two percent of the proposed revenue allocation is for public safety and the rest is for economic development. No other purposes are identified. This proposed allocation aligns exactly with the language of Measure K."

The trial court granted judgment in favor of HJTA, finding that the ordinance was invalid because Measure K failed to obtain approval by two-thirds of voters.

On September 18, 2019, the County appealed. On December 3, 2019, we granted the parties' joint motion for calendar preference and expedited briefing.[1] (Cal. Rules of Court, rule 8.240.)

---

[1] Since the trial court ruled the ordinance invalid, CDTFA has continued to collect the tax and placed the revenues in an escrow account, per Revenue and Taxation Code section 7270, subdivision (c), pending final judgment in this matter. (See also Rev. & Tax. Code, § 7277 [procedures for refund after final judgment that tax is unconstitutional].) All further undesignated statutory references are to the Revenue and Taxation Code.

## DISCUSSION

### *Postelection Challenge to Tax Measure*

We reject the County's preliminary argument that HJTA's postelection challenge to Measure K is barred. The County contends that HJTA could have sued preelection alleging that the Measure K ballot materials were false or misleading and "[w]hen a pre-election remedy is available, it is exclusive." The authority the County cites for this supposed bar is *McKinney v. Superior Court* (2004) 124 Cal.App.4th 951 (*McKinney*), which involved a suit to annul the San Diego mayoral election. The court in *McKinney* did not in fact articulate the broad principle that the County espouses. The court held that postelection challenges must be brought on the grounds enumerated in the Elections Code or be based on a violation of the Constitution. (*McKinney, supra*, at pp. 957-959.)

To be sure, "a postelection challenge to ballot materials is not permitted by the Elections Code. [Citations.]" (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 123 (*Owens*); see also *Denny v. Arntz* (2020) 55 Cal.App.5th 914, 919-923.) However, HJTA's reverse validation action does not challenge the Measure K ballot materials but rather contends that the ordinance is a special tax that is invalid under article XIII C of the California Constitution. This is a substantive constitutional challenge appropriately made postelection. (See *Johnson, supra*, 25 Cal.App.5th at pp. 1019-1020.) Indeed, as the California Supreme Court has observed, " 'it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity. [Citations.]' [Citation.]" (*Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 665; *Costa v. Superior Court* (2006) 37 Cal.4th 986, 1005 (*Costa*); *Bailey v. County of El Dorado* (1984) 162 Cal.App.3d 94, 99-100; 7 Witkin, Summary of Cal. Law (11th ed. 2017) Constitutional Law, § 117, pp. 224-225 ["in a preelection challenge, a ballot measure will be removed only on a 'compelling showing' of invalidity," while

postelection the issue is "only whether the ballot measure is valid"].) "The general rule favoring postelection review contemplates that no serious consequences will result if consideration of the validity of a measure is delayed until after an election. Under those circumstances, the normal arguments in favor of the 'passive virtues' suggest that a court not adjudicate an issue until it is clearly required to do so. If the measure passes, there will be ample time to rule on its validity. If it fails, judicial action will not be required." (*Deukmejian, supra*, at p. 666.)

In this instance, had the measure garnered two-thirds of the vote, the election likely would have rendered HJTA's challenge to the ordinance moot. (See *Costa, supra*, 37 Cal.4th at p. 1007.)

*Standard of Review*

The question whether Measure K is a general tax validly approved by majority of the voters or a special tax that is invalid because it did not obtain two-thirds of the vote is a question of law for this court to determine on an independent review of the facts. (*Weisblat v. City of San Diego* (2009) 176 Cal.App.4th 1022, 1040 (*Weisblat*); *Tesoro Logistic Operations, LLC v. City of Rialto* (2019) 40 Cal.App.5th 798, 806; *Neecke, supra*, 39 Cal.App.4th at p. 953.) "The construction of a statute or an initiative, including the resolution of any ambiguity, is a question of law that we review de novo." (*Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1317.) "Our review of the trial court's interpretation of a statute or constitutional provision is also de novo." (*Gonzalez v. City of Norwalk* (2017) 17 Cal.App.5th 1295, 1305, citing *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933-934 (*California Cannabis*).)

In *California Cannabis*, the California Supreme Court summarized the interpretive process we employ here: "We apply similar principles when construing constitutional provisions and statutes, including those enacted through voter initiative. [Citation.] Our primary concern is giving effect to the intended purpose of the provisions at issue. [Citation.] In doing so, we first analyze provisions' text in their relevant context, which

8

is typically the best and most reliable indicator of purpose. [Citations.] We start by ascribing to words their ordinary meaning, while taking account of related provisions and the structure of the relevant statutory and constitutional scheme. [Citations.] If the provisions' intended purpose nonetheless remains opaque, we may consider extrinsic sources, such as an initiative's ballot materials. [Citation.]" (*California Cannabis, supra*, 3 Cal.5th at pp. 933-934.)

*Measure K Is Not a Special Tax*

Article XIII C defines a " '[g]eneral tax' " as "any tax imposed for general governmental purposes" and a " '[s]pecial tax' " as "any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund." (Cal. Const., art. III C, § 1, subds. (a) & (d); *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2003) 106 Cal.App.4th 1178, 1185 (*Roseville*).) A local general tax requires approval of a majority of voters while a special tax requires a two-thirds majority. (Cal. Const., art. XIII C, § 2, subds. (b) & (d); *Roseville, supra*, at pp. 1185-1186.)[2]

As numerous courts have stated, "[t]he essence of a special tax . . . is that its proceeds are earmarked or dedicated in some manner to a specific project or projects." (*Neecke, supra*, 39 Cal.App.4th at p. 956; *Bay Area Cellular Telephone, supra*, 162 Cal.App.4th at p. 696; *Owens, supra*, 220 Cal.App.4th at p. 131; *Building Industry Assn. of Bay Area v. City of San Ramon* (2016) 4 Cal.App.5th 62, 85 (*Building Industry*); *Johnson, supra*, 25 Cal.App.5th at p. 1028.)

---

[2] We will not revisit in detail the legal background of the voters' adoption of article XIII, Proposition 62 and Proposition 218, which enacted the constitutional and statutory provisions we apply here. This history has been covered in numerous cases including our opinion in *Roseville, supra*, 106 Cal.App.4th at pp. 1182-1185. (See, e.g., *Johnson, supra*, 25 Cal.App.5th at pp. 1024-1028; *Bay Area Cellular Telephone Co. v. City of Union City* (2008) 162 Cal.App.4th 686, 692-693 (*Bay Area Cellular Telephone*).)

The County initially argues that the plain language of Measure K "demonstrates it imposes a general tax," because "[i]t incorporates a statute authorizing general taxes, Revenue and Taxation Code section 7285." The County refers to section 5.60.030 of the ordinance listing four "purposes," the first of which states in relevant part: "To impose a retail transactions and use tax in accordance with . . . Section 7285, which authorizes the County to adopt this tax chapter, which will be operative if a majority of the electors voting on the measure vote to approve imposition of the tax at an election called for that purpose." Reference to section 7285, however, does not indicate whether or not the tax is "earmarked or dedicated in some manner to a specific project or projects." (*Neecke, supra*, 39 Cal.App.4th at p. 956.) Section 7285 simply authorizes a county to impose a general tax if approved by a majority of voters.[3] As the County acknowledges, section 7285.5 is a similar authorizing statute for a special tax adopted by two-thirds of the voters.

The County also argues Measure K is a general tax because "it is based on CDTFA's model general tax ordinance." The model, as the County also acknowledges, is suitable for any sales tax ordinance administered by CDTFA. "Because CDTFA administers transactions and use taxes, local governments must use CDTFA's form of ordinance or risk CDTFA's refusal to administer it. The vast majority of Measure K is therefore identical to other transactions and use taxes adopted throughout the state."

---

[3] Section 7285 provides in relevant part: "The board of supervisors of any county may levy, increase, or extend a transactions and use tax throughout the entire county or within the unincorporated area of the county for general purposes at a rate of 0.125 percent or a multiple thereof, if the ordinance proposing that tax is approved by a two-thirds vote of all members of the board of supervisors and the tax is approved by a majority vote of the qualified voters of the entire county if levied on the entire county or the unincorporated area of the county if levied on the unincorporated area of the county, voting in an election on the issue. . . . The revenues derived from the imposition of a tax pursuant to this section shall only be used for general purposes within the area for which the tax was approved by the qualified voters."

10

Nonetheless, the County maintains that the reference to section 7285 in the recitation of "purpose" in the model, reproduced in Measure K, is "relevant" to the determination on appeal whether it is a general or special tax. We disagree. The language of additional "purposes" set forth in the model ordinance and Measure K—i.e., to adopt an ordinance that conforms with state sales tax law and can be administered by CDTFA, as well as the provision requiring the county to contract with CDTFA to administer the tax—confirm that the purpose of the model ordinance is to facilitate the state agency's administration of a county sales tax ordinance. CDTFA also requires local government to use a model ordinance for a special tax. The only difference from the model ordinance for a general tax is the reference to section 7285.5, instead of section 7285, and the ordinance becoming operative if approved by a two-thirds vote, instead of a majority.

We note that, unlike Measure K, the model ordinance does not include a section on use of the tax proceeds, which would be relevant to the issues on appeal.

We turn to the County's more persuasive contention that the provision in Measure K that tax proceeds will be used for "public safety services" and "essential services" does not render the ordinance a special tax. As mentioned, section 5.60.160 of the ordinance provides that the revenue from the tax "shall be used entirely to maintain and improve public safety services and essential services for the benefit of the unincorporated areas of the County." Given the broad nature of these terms, in interpreting them, we also consider the ballot materials. (*California Cannabis, supra*, 3 Cal.5th at pp. 933-934.)

In *Roseville*, we observed that "a tax is special whenever expenditure of its revenues is limited to specific purposes; this is true even though there may be multiple specific purposes for which revenues may be spent." (*Roseville, supra*, 106 Cal.App.4th at p. 1185; *Monterey Peninsula Taxpayers Assn. v. County of Monterey* (1992) 8 Cal.App.4th 1520, 1535.) Thus, we held that a tax measure providing that "all revenue from the tax shall 'be budgeted and appropriated solely for police, fire, parks and recreation or library services' " on its face "proposed a special tax that required a two-

11

thirds majority for approval pursuant to Proposition 218." (*Roseville, supra*, at p. 1186; see also *Neilson v. City of California City* (2005) 133 Cal.App.4th 1296, 1302 [special tax provided proceeds would be used " 'to pay for police, fire, and recreational services, and to repair streets, parks, water line replacement and repair, and building maintenance' "].)  By contrast, a tax measure that provides examples of revenue use but does not limit expenditure to the enumerated uses is not a special tax.  In *Owens*, the court found that the ballot summary of a tax measure did not indicate that the proposed tax was a special tax.  "The summary stated that the tax would fund 'essential services, *including* sheriff's deputies, parks, libraries, street repairs, and *other general fund services.*' " (*Owens, supra*, 220 Cal.App.4th at p. 131, fn. 13.)  The court concluded that tax revenues "are not earmarked for any specific project" and therefore the tax was "a general tax." (*Id.* at p. 131.)

We conclude that Measure K is like the tax measure in *Owens* and not like the measure in *Roseville*.  As in *Owens*, the Measure K ballot summary stated that tax was "[t]o maintain and protect essential services *such as* 9-1-1 emergency medical/fire response; improving wildland fire containment; maintaining 24-hours sheriff's patrol; attracting/retaining jobs, businesses and qualified sheriff deputies; and other essential services . . . ." (Italics added.)  The trial court referred to the fact that the ballot materials gave "specific examples" of services included in "public safety services."  But in employing the phrase "such as," the ballot also indicated tax revenues could be used for unspecified services.  Examples are not the equivalent of earmarks.  In *Johnson*, the court said "while the ballot argument listed some of the general services that could be funded, none of the funds were 'earmarked or dedicated' to any specific project, but instead were intended to provide funding for *general* county services." (*Johnson, supra*, 25 Cal.App.5th at p. 1029.)

The trial court addressed the meaning of "other essential services," where the ballot summary did not provide examples, by equating "public safety" and "essential

services."  However, this analysis renders the term "essential services" surplusage, which we must avoid in interpreting the measure.  (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 54; *Building Industry, supra*, 4 Cal.App.5th at p. 75.)  The court also strained to categorize the "essential services" of "attracting/retaining job, businesses" as "public safety services" by explaining that "[e]conomic development is essential to the existence of all other government services and is undoubtedly benefitted by more public safety services."  In this formulation, the terms "public safety services" and "other essential services" can be stretched to mean almost any expenditure that is "essential to the existence of all other government services," rather than funds earmarked for specific projects.[4]

It is conceivable that a special tax could earmark the proceeds for specific purposes by defining public safety services.  (See Gov. Code, § 53102 [defining " '[p]ublic safety agency' " as "a public agency which provides firefighting, police, medical, or other agency services" in statute establishing 911 as the primary emergency telephone number].)  However, in *Johnson*, the argument in favor of the tax measure in the ballot pamphlet described " 'public safety' " as including " 'general County services.' "  (*Johnson, supra*, 25 Cal.App.5th at p. 1029, italics omitted.)  The *Johnson* court also cited *Owens* where the "ballot summary of [the] measure in question, which stated that 'the tax would fund "essential services, *including* sheriff's deputies, parks, libraries, street repairs, and *other general fund services*," ' did not change the nature of [the] tax from a general to a special tax."  (*Johnson, supra*, 25 Cal.App.5th at p. 1029; *Owens, supra*, 220 Cal.App.4th at p. 131, fn. 13.)  In both *Johnson* and *Owens*, "public

---

[4] The range of "essential services" that the tax proceeds might fund is reflected in the diversity of proponents of Measure K, including law enforcement and fire protection officials but also a children's advocate, economic development/local business advocate and a victim's rights advocate.

safety" and "sheriff's deputies" were described as "general" services provided by county government whose funding by the proposed tax did not transform a general tax into a special tax.  Indeed, we find the closest parallel to Measure K in *Owens* where, as here, a general tax used the term " 'essential services' " to include " 'sheriff's deputies.' " (*Owens, supra*, 220 Cal.App.4th at p. 131, fn. 13.)

HJTA attempts to distinguish *Johnson* and *Owens* on the basis that the ballot materials in both cases explicitly referred to the tax as funding "general" purposes or services.  As did the trial court, HJTA points out that "the County never informed voters in the text of Measure K or in *any* of its official election materials that Measure K proposed a tax for general governmental purposes."  Use of the term "general" or not does not differentiate a general from a special tax.  The question is whether the tax proceeds are earmarked for specific projects.  A tax measure providing that "all revenue from the tax shall 'be budgeted and appropriated solely for police, fire, parks and recreation or library services,' " would be a special tax even if the measure characterized these services as "general county services."  (*Roseville, supra*, 106 Cal.App.4th at p. 1186.)  By contrast, ballot materials for a tax measure like Measure K that is open-ended and refers to "including" specified services, or "such as" specified services given as examples, while informing the electorate that unspecified "other essential services" will also be funded, is indicative of a general tax.

Moreover, there appears to be no fixed meaning of the term "other essential services."[5]  In *City of Oakland v. Digre* (1988) 205 Cal.App.3d 99, the court distinguished between " 'essential' services such as police and fire protection and

---

[5] The dictionary definition of "essential" as "of the utmost importance: BASIC, INDESPENSABLE, NECESSARY" does not settle the question of what are "essential services" so much as reiterate it.  (Merriam-Webster's Collegiate Dictionary (11th ed. 2006) p. 427, col. 1.)

14

'elective' services not automatically enjoyed by all residents, such as parks, libraries, museums, and youth centers." (*Id.* at p. 108.) However, Business and Professions Code section 13410 regarding mandatory sale of motor vehicle fuels and lubricants to a city or county defines " 'essential services' " as "police, fire, health, and transportation services provided by public agencies." (Bus. & Prof. Code, § 13410, subd. (c).) Revenue and Taxation Code section 42100, subdivision (b)(3), states that local charges collected for prepaid mobile telephone services "are used to pay for such essential governmental services as public safety, streets, parks, libraries, senior centers, and many more." In Public Resources Code section 5780 regarding a municipality's authority to acquire property for open-space and recreational use, the Legislature declared that "the provision of recreation, park, and open-space facilities and services are essential services which are important to the public peace, health, and welfare of California residents."

Echoing the trial court, HJTA points to the accountability provisions of Measure K as indicative of a special tax, including section 5.60.160 that "[a]ll proceeds of the tax levied and imposed hereunder shall be accounted for and paid into a public safety/essential services trust fund or account designated for use by the County for such specified purposes," as well as section 5.60.170 that establishes a Citizens' Oversight Committee with a duty to "review the revenue collected pursuant to this ordinance and provide an audit report on the use of that revenue to the Board of Supervisors at least annually . . . ." HJTA notes that Government Code section 50075.1 requires that a local special tax subject to voter approval shall provide accountability measures including " '[t]he creation of an account into which the proceeds shall be deposited' " and " '[a]n annual report . . . .' "

However, in *Weisblat, supra*, 176 Cal.App.4th 1022, the court concluded that a levy was a general tax where the proceeds were "tracked in accounts separated from other tax receipts" but ultimately could be used for general governmental purposes. (*Id.* at pp. 1044-1045; but see *Building Industry, supra*, 4 Cal.App.5th at pp. 88-89

15

[distinguishing *Weisblat* where tax "was consistently identified as a special tax"].) Here, tax proceeds deposited in a separate account for unspecified "other essential services" may be used for any and all government services that qualify as "essential services," and are not dedicated to a specific project or purpose. The function of the separate account and Citizens' Oversight Committee's annual audit provisions in Measure K is to inform and assure voters that the tax revenues have been spent on "public safety services" and "other essential services." But these terms do not define a special tax and the inclusion of accountability provisions in Measure K does not alter the nature of the tax.

In sum, we find that Measure K proposed a general tax that was approved by a majority of voters and is therefore a valid tax.[6]

### DISPOSITION

The judgment is reversed. The County shall recover costs. (Cal Rules of Court, rule 8.278(a)(1), (2).)


<u>          /s/                    </u>
RAYE, P. J.


We concur:


<u>        /s/                    </u>
MAURO, J.


<u>        /s/                    </u>
RENNER, J.

_____

[6] HJTA submitted a request for judicial notice of materials other than the ballot materials, including Facebook posts, and both parties requested judicial notice of materials related to the current coronavirus crisis. We deferred ruling on the requests and now deny them.

16